**WESTERN AIR LINES, Inc. v. CIVIL AERONAUTICS BOARD.**

No. 12867.

United States Court of Appeals
Ninth Circuit.

Jan. 31, 1952.

See also, 9 Cir., 190 F.2d 340.

212

Guthrie, Darling & Shattuck, Los Angeles, Cal., for petitioner.

H. G. Morison, Asst. Atty. Gen., J. Roger Wollenberg, Sp. Asst. to Atty. Gen., John H. Wanner, Acting Gen. Counsel, James L. Highsaw, Jr., Chief, Litigation & Research Division, O. D. Ozment and Charles H. Resnick, Attys., Civil Aeronautics Board, Washington, D. C., for respondent.

Edward J. Hickey, Jr., Washington, D. C., Richard R. Lyman, Clarence M. Mulholland, Toledo, Ohio (Mulholland, Robie & Hickey, Toledo, Ohio, of counsel), for intervening respondent Brotherhood of Railway & S. S. Clerks.

Dana, Bledsoe & Smith, San Francisco, Cal., Joseph W. Rogers, Jr., San Francisco, Cal. (John B. Lampe, Chicago, Ill., of counsel), for Air Line Pilots, as amicus curiae.

Before MATHEWS, HEALY, and POPE, Circuit Judges.

HEALY, Circuit Judge.

Western Air Lines seeks review of two orders of the Civil Aeronautics Board retrospectively imposing labor protective provisions as a condition to the transfer by Western to United Air Lines of a certificate of public convenience and necessity for operation between Los Angeles and Denver (Route 68), and of various properties incident to the route.[1]

The original proceeding, begun before the Board in 1947, involved the question whether approval of the proposed transfer should be conditioned upon observance by the parties of provisions designed to protect employees adversely affected by the transfer. The Air Line Pilots Association, an intervenor in the proceedings, specifically requested that protective conditions be imposed for the benefit of the Western pilots assigned to Route 68. A like request was made by the Brotherhood of Railway and Steamship Clerks on behalf of Western's clerical employees. Western agreed to submit information at the hearing concerning the effect of the transfer upon employees, and the hearing was in part devoted to this question. The Board's original order, issued August 25, 1947, imposed no conditions on the subject. In its opinion or findings accompanying the order the Board indicated that the omission was being made in light of the testimony of Western's president that no employee would be adversely affected by the transfer of the route.

It appears that on September 4, 1947, 10 days after the approval by the Board of the transfer of the route, Western notified 23 of its pilots that new schedules would require their removal from the payroll effective September 19, 1947. On September 9, 1947, other Western employees were notified by letter that they would be furloughed on September 14, "due to the disposal of Route 68." Without knowledge

1.  Review is authorized by 49 U.S.C.A. § 646.

of these facts, the Board on September 11, 1947, issued its supplemental order transferring the certificate for Route 68 to United, effective September 15, 1947. The effective date corresponded with that prescribed in the contract between Western and United.

Rule 11 of the Board's Rules of Practice [2] provides a 30-day period within which petitions may be filed for reconsideration of Board orders. Within this period, namely on September 24, 1947, the Air Line Pilots Association filed a petition for reconsideration of the Board's order of approval, alleging in substance that, contrary to the assurances of Western's president, pilots of Western were in fact being discharged because of the transfer of Route 68. The petition requested that labor protective conditions be imposed. Similar petitions were filed on behalf of mechanical and clerical employees. On September 29, 1947, Public Counsel recommended that the Board defer passing upon these petitions until the parties had made an effort to reach voluntary arrangements for the protection of Western's displaced employees, and it was recommended that in the event the parties should fail to agree the proceedings be reopened for the purpose of determining what employee protective conditions, if any, should be imposed.

The Board followed these recommendations, and the record indicates that over a long period it made efforts and held conferences looking toward an informal settlement. The efforts came to naught, and in July of 1948 the Brotherhood of Railway and Steamship Clerks informed the Board that nothing further could be accomplished by the negotiations. On August 25, 1948, the Board reopened the proceeding for the purpose of determining whether any employees of Western had been adversely affected as a result of the transfer, and if so, whether any employee protective conditions should be attached to the Board's approval of the transfer. After completion of the usual procedural steps the Board, on July 7, 1950, issued its opinion and order providing for the protection of adversely affected employees. The order provided that in the event of a failure to agree among the parties as to the persons who sustained monetary loss, and what such losses were, the parties should submit to arbitration on those issues, the Board retaining jurisdiction to modify or clarify the terms of its order. A clarifying order was subsequently issued on December 29, 1950. It is these two latter orders that are before us for review.

■ Western contends that the Board is without statutory authority to impose labor protective conditions on the approval of a transfer. It is not open to doubt that the Board has power to condition its approval by the imposition of terms bearing some just relation to the public interest. Section 401(i) of the Civil Aeronautics Act, 49 U.S.C.A. § 481(i), provides that "No certificate may be transferred unless such transfer is approved by the Board as being consistent with the public interest." And where, as here, air carrier properties are to be transferred with the certificate. Board approval is likewise required. See § 408 of the Act. The latter section expressly authorizes approval of the acquisition "upon such terms and conditions as [the Board] shall find to be just and reasonable and with such modifications as it may prescribe: * * *." The only problem, then, is whether conditions for the protection of employees can reasonably be said to bear a substantial relation to the public interest.

■ In United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208, the Court held that comparable provisions of the Interstate Commerce Act authorized the Commission to impose labor protective conditions upon railroad mergers and consolidations notwithstanding the absence of express statutory authority. The Court stressed the national interest in the stability of the labor supply available to the railroads. Among other things it said, 308 U.S. at page 238, 60 S.Ct. at page 255: "we cannot say that the just and reasonable conditions imposed on appellees in this case will not promote the public

2. 14 C.F.R. (1946 Supp.) 285.11.

interest in its statutory meaning by facilitating the national policy of railroad consolidation; *that it will not tend to prevent interruption of interstate commerce through labor disputes growing out of labor grievances, or that it will not promote that efficiency of service which common experience teaches is advanced by the just and reasonable treatment of those who serve."* [Emphasis supplied.] The reasoning is in large part equally applicable to interstate carriage by air. Congress has recognized the similarity of the labor problem in the two forms of transportation by specifically making the Railway Labor Act applicable to air carriers.[3]

Western insists that in any event the Board must impose the conditions prospectively, that is, contemporaneously with its approval of the transfer, not *ex post facto* as here. It points out that if the Board, at the time of its approval of a transfer, conditions its approval, either party to the sale may choose not to accept the approval as conditioned and is free at that stage to abandon the contract. Hence, says Western, the Board may not approve a transfer as being consistent with the public interest and then later, after the certificate has been transferred, impose onerous conditions which are as of that time necessarily mandatory on the carrier.

In other circumstances the argument would have much force, but it is not impressive here. Western is in no position to claim surprise; it acted with its eyes open and at its own risk. It was aware that the proceedings before the Board had not become final, and would not until the expiration of the period of 30 days within which petitions for reconsideration might be filed. It knew that labor protective provisions had been a vital subject of consideration at the original hearing and that the Board had omitted the imposition of conditions of that sort, assertedly in reliance on the testimony of Western's president that they were unnecessary. Yet within a matter of days after the initial approval Western gave notice of the layoff of 23 of its pilots, and a few days later furloughed a number of other employees, expressly giving as the reason for the latter action the sale of Route 68. That this displacement of personnel would lead, as it did, to a petition or petitions for reconsideration was virtually inevitable. Nor was the transfer of the certificate as of September 15, 1947 compelled by the Board in the sense Western would have us believe. Western's contract with United itself provided that the consummation of the transfer should take place on the 21st day following the Board's approval of the acquisition. In fixing September 15 as the effective date the Board merely gave effect to the agreement of the parties. Western did not, as common prudence would have suggested, request that the transfer be held up or the date postponed.

A final and more serious question remains to be considered. Western contends that the Board was in error in requiring it to submit to arbitration for the purpose of resolving disputed questions as to the identity of employees adversely affected and as to the amount of compensation due them. This, Western insists, constitutes a delegation of the Board's function to arbitrators, and operates to deprive Western of its legal right to a hearing and to an effective review. The Board says that this is not so. It calls attention to the fact that it has prescribed in great detail the formula to be applied in determining compensation due adversely affected employees, leaving to the arbitrators, in the event the parties themselves are unable to agree, the mere ministerial task of applying the formula. It observes that the procedure accords with that prescribed by the Interstate Commerce Commission in the so-called Burlington formula which the Commission has employed in imposing labor protective conditions. See Chicago, Burlington & Quincy Railroad Abandonment, 257 I.C.C. 700; Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177.

If no more were at issue here than the determination of the amount of compensation owing to definitely ascertained individuals the procedure might conceivably be

3.   45 U.S.C.A. § 181; 49 U.S.C.A. § 481(*l*).

thought not improper. But in its order imposing conditions, entered July 7, 1950, the Board found only that *some* Western employees were adversely affected by the transfer of the route. It made no finding as to their identity or as to their number, stating that it could not do so on the record before it. On this phase of the matter the facts are seriously in dispute. Western insists that the displacement or loss of seniority of employees, particularly of pilots, would have been necessitated anyway by existing conditions, regardless of the transfer. While the Board's formula does point the way to computation of the compensation once the individuals affected are ascertained, it clearly affords no clue to the resolution of the controversy in the respects just indicated.

It is vital to remember that Western, due to a combination of circumstances not entirely within its control, is confronted after the event, not with a condition which it is free to accept or reject as would normally be the case in transactions of this character, but with a mandatory order in the nature of a judgment for the payment of money with which it will have no option but to comply. It would seem that Western is entitled to the procedural safeguards usually accorded a party against whom such an order or judgment is being sought. These, we suppose, would include a hearing before the agency or its fact-finding officer, the opportunity to introduce evidence, and to make a record adequate for the purposes of review. We are unable to believe that enforced arbitration affords these safeguards; nor do we think that Western is estopped by its own conduct from objecting to the requirement of arbitration. It is thought that the procedure prescribed by the Administrative Procedure Act [4] is obligatory in the unusual circumstances obtaining here. Naturally the Board cannot be expected to handle this matter itself, but the appointment of a master or an examiner to take evidence on the disputed issues and to make or recommend findings would be an appropriate course. We think it would not be improper to impose on Western the cost of the proceeding on reference.

The challenged orders are modified so as to eliminate the arbitration feature and to provide for a hearing of the nature indicated.

4. See 5 U.S.C.A. § 1006 and cognate provisions of the Act.