## NATIONAL LABOR RELATIONS BOARD v. GUY F. ATKINSON CO. et al.

### No. 12880.

United States Court of Appeals
Ninth Circuit.
Feb. 29, 1952.

Rehearing Denied March 21, 1952.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen., Counsel, A. Norman Somers, Asst. Gen. Counsel, Dominick L. Manoli, Melvin Pollack, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Gardiner Johnson, Thomas E. Stanton, Jr., San Francisco, Cal., for respondent.

William H. Thomas, General Counsel, Cleveland, Ohio (William C. Robbins, Spokane, Wash., amicus curiae, of counsel), for International Union of Operating Engineers, AFL Local 370.

Before MATHEWS, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board which declared the respondent guilty of an unfair labor practice. The complaint was based upon charges that respondent discharged an employee, one Hewes, for failure to maintain his membership in a union with which respondent had executed a closed shop contract. In July, 1947, respondent, a joint venture composed of the two corporations named in the title, was awarded a contract for the construction of certain facilities required by the Atomic Energy Commission, and General Electric Company, prime contractor, at or near Richland, Washington. The job was regarded as an emergency, and the notice of award of the contract preceded detailed specifications to enable respondent immediately to assemble a labor force.

Accordingly respondent, before employing any of its manual labor, requested the Building Trades Department of the American Federation of Labor at Spokane to assist it in manning the job. This group had what the union would call "jurisdiction" over the area. Substantially all of the workers of the types required for the job belonged to its constituent unions, and respondent, in seeking the help of the Building Trades Department in recruitment of its labor, was following the procedures common in the industry. On August 16, 1947, respondent and 15 unions, affiliates of this labor group, executed the closed shop agreement [1] here involved. One of the 15 unions

---

1. The contract provided in part: "It is understood and agreed that the Employer shall retain in employment only members in good standing of Union or Those Who have signified their intention of becoming members through the regularly established procedure of the Union. While the Union assumes all responsibility for the continued membership of its members and the collection of membership dues, it reserves the right to discipline its members and/or those employees who have filed applications to become members; and the Employer agrees to, upon written notice from the Union, release from employment any employees who fail to maintain membership in good standing and/or any employee who defaults in his obligation to the Union." The contract, by its terms, was to expire August 1, 1948.

was International Union of Operating Engineers, Local 370, A.F.L. On the date of execution of the contract respondent had 125 manual employees, including 10 operating engineers. The latter were members of Local 370, which they had designated as their authorized collective bargaining agent. The record shows that as of December 31, following, the work force had grown to 5400 manual employees, of whom 740 were operating engineers. Throughout the year 1948, total employment did not drop below 8400.

In October, 1947, Hewes, a machinist, who was a member of a machinists union (IAM) applied to respondent for work and was referred to the Union of Operating Engineers. He then applied and was accepted for membership in that union, and received an introduction card assigning him to work. The following February, Hewes was in default on account of dues owing Local 370, and upon the union's demand, he was discharged from the payroll. It was this discharge which led to the complaint and to the board's order now before us.

The contract of August 16, 1947, was executed before the date when the Labor Management Relations Act of 1947, Taft-Hartley, 29 U.S.C.A. § 141 et seq., became effective. Hence, if the contract was made with the representative of the employees in the appropriate collective bargaining unit, its closed shop provisions were valid, and would constitute a defense to the charge made here.[2]

At the time the contract was made, and indeed throughout the period since the enactment of the original (Wagner) Act, 49 Stat. 449, 1935, 29 U.S.C.A. § 151, et seq., the Board had refused to take jurisdiction in such cases, where the building and construction industry was involved.[3] Respondent says that since the agreement was made and action thereunder taken[4] at a time when the Board was refusing to exercise jurisdiction over the industry, an application of a contrary policy in this proceeding amounts to adjudging contrary to law actions, which, when taken, were not subject to the application of sanctions under the law. This, it is said, is the equivalent of a

2. The amended Act provides: "§ 102. No provision of this title shall be deemed to make an unfair labor practice any act which was performed prior to the date of the enactment of this Act which did not constitute an unfair labor practice prior thereto, and the provisions of section 8(a) (3) and section 8(b)' (2) of the National Labor Relations Act as amended by this title shall not make an unfair labor practice the performance of any obligation under a collective-bargaining agreement entered into prior to the date of the enactment of this Act, or (in the case of an agreement for a period of not more than one year) entered into on or after such date of enactment, but prior to the effective date of this title, if the performance of such obligation would not have constituted an unfair labor practice under section 8(3) of the National Labor Relations Act prior to the effective date of this title unless such agreement was renewed or extended subsequent thereto." 29 U.S.C.A. § 158 note.

§ 8(3), thus referred to, contained the proviso: "Provided, That nothing in this Act, or in the National Industrial Recovery Act (U.S.C., Supp. VII, Title 15, §§ 701–712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other

statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective bargaining unit covered by such agreement when made."

3. Johns-Manville Corporation, 61 N.L.R.B. 1 (1945). See "Impact of the Taft-Hartley Act on the Building and Construction Industry", 60 Yale L.J., 673 (1951).

4. The first construction industry case in which the Board appears to have assumed jurisdiction was Ozark Dam Constructors, 77 N.L.R.B. 1136, (1948). Three later cases which reached the Supreme Court are National Labor Relations Board v. Denver Bldg. Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L. Ed. 1284; International Brotherhood of Electrical Workers v. Labor Board, 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; and Carpenters Union v. Labor Board, 1951, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309.

retroactive application of a newly adopted rule, and a denial of due process.[5]

The Board ruled that its previous non-assertion of jurisdiction over construction projects under the Wagner Act was an administrative choice rather than a legal necessity, and pointed to its changed practice in this respect under the 1947 Act.[6] Proceeding to exercise its jurisdiction, the Board held that the closed shop agreement of August 16, 1947, was not a defense against the allegations of an unfair labor practice in the discharge of Hewes. This, it stated, was because International Union of Operating Engineers, Local 370, A.F.L., was not "the representative of the employees as provided in § 9(a), in the appropriate collective bargaining unit covered by such agreement when made." The Board pointed to the small work force on August 16, 1947, how the 10 operating engineers employed on that date had grown to 740 by the end of the year, and said: "It is thus clear, without considering further increments thereafter and without attempting to determine the scope of an appropriate unit, that in virtually all categories, including that of the operating engineers, the work force at the time the contract was signed was not at all representative of that shortly to be employed. Under these circumstances, the union could not have been, as required by the proviso to Section 8(3), the representative of the employees in an appropriate unit."

■ The rule thus expressed, suggesting that where a group of employees is rapidly expanding, so that the initial work force cannot truly represent more than a small fraction of the contemplated total, it will not be recognized as representative of an appropriate unit, is one frequently followed

by the Board. Coast Pacific Lumber Co., 78 N.L.R.B. 1245, 1246 (1948); Westinghouse Electric Corporation, 85 N.L.R.B. 1519 (1949); Anaconda Wire and Cable Co., 91 N.L.R.B. No. 37, (1950). A collective bargaining agreement made under those circumstances has been held ineffective. Daniel Hamm Drayage Co., 84 N.L.R.B. 458, (1949), enforced N.L.R.B. v. Daniel Hamm Drayage Co., 5 Cir., 185 F. 2d 1020.

We think there can be no doubt, speaking generally, of the Board's power to enforce such a policy. The Act, § 9(b), provides that the Board shall in each case decide whether "the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit", etc. This, the section states, is in order "to assure to employees the fullest freedom" in exercising their rights under the Act. The policy is a reasonable one, and well calculated to preserve the principle of majority rule.

■ And with respect to the other policy decisions here referred to, namely, whether the Board should abstain, or assume jurisdiction, in respect to a particular industry, or a particular labor dispute, this court has held that they are exclusively for the Board. Haleston Drug Stores v. National Labor Relations Bd., 9 Cir., 187 F.2d 418.

But the problem here is whether the Board, in pursuing an undoubted right to choose a policy in this regard, first, that it would refrain from taking jurisdiction in respect to the construction industry, and later, to announce a contrary policy, was essentially exercising a legislative function, and announcing a rule for action in the future. If the statement of the earlier policy was in effect an announcement governing

5. Local 370, filing a brief as amicus curiae, says: "The Board's order, therefore, represents the first assertion of its complete reversal of administrative policy, thereby nullifying both rights and obligations which the parties have been led to rely on by virtue of the Board's policy, as previously asserted. To this extent, therefore, the Board's order is an arbitrary and capricious exercise of its administrative authority, and is violative both of the intent of Congress and of

the rights guaranteed by the Fifth Amendment of the Constitution of the United States."

6. It is to be noted that the jurisdictional clauses of the new act were no different than those of the original act. §§ 9(c) (1), 10(a), 2(6) and 2(7), 29 U.S.C.A. §§ 159(c) (1), 160(a), 152(6) and (7). For a discussion of the reasons which prompted the new policy, see 60 Yale L.J. 673, supra, note 3.

its future action, was its withdrawal of that statement, or reversal of the earlier policy required to have future effect only? Must it be denied retroactive effect? In particular reference to the facts here, after respondent had proceeded in good faith to make the customary closed-shop contracts with the Building and Construction Trades Department, A.F.L., at a time when no union could have had its request for certification processed by the Board, may the Board make an example of the respondent, by retroactively applying to its conduct, at the time it made the contract, and discharged Hewes under it, a ruling it would then have refused?[7]

We are urged to say that the Board's application of these sanctions to respondent because of something the latter has done at a time when the Board's change of policy had not been announced, was beyond the Board's power for the same reasons which led to condemnation of retroactive application of rates by the Interstate Commerce Commission in Arizona Grocery v. Atchison Ry., 1932, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348. The question there was whether the Commission could award reparations with respect to shipments which had moved under rates previously approved by it. The court said 284 U.S. at page 389, 52 S.Ct. at page 186: "The Commission's error arose from a failure to recognize that, when it prescribed a maximum reasonable rate for the future, it was performing a legislative function, and that, when it was sitting to award reparation, it was sitting for a purpose judicial in its nature. In the second capacity, while not bound by the rule of res judicata, it was bound to recognize the validity of the rule of conduct prescribed by it, and not to repeal its own enactment with retroactive effect. It could repeal the order as it affected future action, and substitute a new rule of conduct as often as occasion might require, but this was obviously

the limit of its power, as of that of the Legislature itself."

Heretofore the Board has had occasion to stay its hand, and withhold the application of sanctions against employers solely because they had acted in reliance upon the Board's earlier policy of abstention. See Compressed Air etc. Union and James P. Kenny, 93 N.L.R.B. 274; C. A. Braukman, etc. and International Union of Operating Engineers, 94 N.L.R.B. 234. In the last cited matter the Board had twice dismissed petitions by unions for certification as bargaining representative of the respondent's employees on the ground that the Board did not believe certification would effectuate the policies of the act because the effect of the employer's business on interstate commerce was too remote. In the interim between the dates when such petitions were dismissed charges of unfair labor practices were filed against the employer and subsequently a complaint was filed based on the charges. The Board said: "When the complaint issued, the Board was reexamining its policy concerning the exercise of jurisdiction; thereafter, during October, 1950, we announced certain specific criteria for the assertion of jurisdiction. It appears, as found by the Trial Examiner, that the Respondent's volume of interstate commerce at about the time the alleged unfair labor practices were committed satisfied the Board's current jurisdictional criteria. The question thus posed is whether or not the Board should apply retroactively its present jurisdictional standards, and assert jurisdiction in the instant complaint case, although the Board had before and after the commission of the alleged unfair labor practices, refused to assert jurisdiction over the Respondent's operations on the basis of then existing standards.

"The Board believes that the question should be answered in the negative. This result is dictated not only by the Board's ob-

---

7. This is an aspect of the case which was apparently not considered in National Labor Relations Board v. Kobritz, 1 Cir., 193 F.2d 8. There, in a case charging egregious anti-union activities by the employer, a *wholesaler of meat*, it was argued that the Board should not have asserted jurisdiction in the matter, be-

cause previously it would not have done so. The court held simply that the Board had jurisdiction under the Act, and said, as we have, that it was for the Board to decide when it would alter its policy and assume jurisdiction. The question raised was solely one of jurisdiction.

ligation to respect its own prior decisions, but also by a desire for fair play. It would be inequitable now to hold the Respondent liable for the activities in question, as the Board, almost two years ago, in effect advised the Respondent that such activities occured at a time when 'it would [not] effectuate policies of the Act to assert jurisdiction' over the Respondent's operations.

"Moreover, in Yellow Cab Company of California the Board recently held that 'sound policy precludes reconsideration of complaint cases which were disposed of before the adoption of the present jurisdictional standards.' True, the Board has not heretofore considered the instant complaint case. However, because the Board does not, with respect to the question of jurisdiction, differentiate between representation and complaint cases, we believe that dismissal of the second representation case on jurisdictional grounds on July 11, 1949, was in effect, notice to all parties concerned that any complaint case based on alleged unfair labor practices occurring before that date would similarly be dismissed. The policy considerations which warranted dismissal of the complaint in the Yellow Cab case are analogous to those presented here. On the basis of the foregoing, we shall therefore dismiss the complaint in its entirety."

In National Labor Relations Board v. Baltimore T. Co., 4 Cir., 140 F.2d 51, the court alluded with apparent approval to the fact that the Board had endeavored to avoid making its sanctions operate retroactively.[8]

The cases to which we have referred differ in one respect from the one before us in that in each of those cases the prior order declining to assert jurisdiction was in other proceedings involving the same employer. This fact is called to our attention in the Board's reply brief; and in the Braukman case, supra, from which we have quoted, the Board was careful to point out that its decision there was not to be taken as a statement that it would dismiss a complaint solely because the alleged unfair labor practices occurred at a time when the Board would not have asserted jurisdiction over the employer.[9]

In the decision of the Board which was reviewed in National Labor Relations Board v. Baltimore T. Co., supra; 47 N.L.R.B. 109, (1943), the Board made it plain that in staying its hand with respect to sanctions directed to practices committed prior to notice of the Board's policy change, it was not doing so because bound by any rule of res judicata, but that it limited its action in the exercise of its administrative discretion and in an endeavor to make an equitable order.[10]

■ Even if what we deal with here, a change in administrative policy, is in sub-

8. 140 F.2d at page 55: "The fact that the Board had taken the position in 1937 that the company was not subject to its jurisdiction was not a matter precluding action but one to be considered in determining what action would be appropriate to wipe out the effect of the unfair labor practices found to exist. In consideration of its prior position, the Board limited the back pay awards in the case of discriminatory discharges, and the refund of dues paid to the company dominated union, to the period subsequent to its filing of the complaint herein against the company. The date of the filing of the complaint was the time when the company was notified that the Board was no longer adhering to the position taken in 1937 that it was without jurisdiction of unfair labor practices by the company; and there is nothing unreasonable in requiring the company to take action to undo the effect of unfair labor practices allowed to continue after that date."

9. "Nor do we here decide that we would dismiss a complaint solely because the alleged unfair labor practices occurred at a time when the Board would not have asserted jurisdiction over the particular employer involved."

10. The Board said: "The respondents contend that, because of the dismissal by the Board's Regional Director on September 29, 1937, for 'lack of jurisdiction', of a charge previously filed against the respondents under the Act, the Board is now without jurisdiction to make any findings of unfair labor practices on the part of the respondents at least until the prior 'adjudication' is reversed. We are of the opinion and we find, as did the Trial Examiner, that the dismissal of the charge filed in 1937 is not res judicata of the question of the applicability of the

stance a change in administrative rules, authority is not wanting that such altered rules may, in some cases, be applied retroactively. Such a problem was discussed at great length in Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 91 L.Ed. 1995, et seq., in a case in which the Securities and Exchange Commission was recognized to have announced and applied a new standard of conduct by which the parties were held retroactively bound.[11]

The Chenery case may perhaps be distinguished in that there the Commission was confronted with the necessity of making an order relating to a corporate reorganization in respect to which it was its duty and obligation to attach appropriate conditions for approval. It did not have the opportunity, as the National Labor Relations Board did in the Braukman case, supra, to dismiss the pending proceedings because enforcement would under the circumstances be inequitable. The Commission was operating under compulsion comparable to the dilemma in which the Supreme Court found itself in Addison v. Holly Hill Fruit Products Inc., 1944, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488. There the court faced the problem of disposing of a case in which it had held invalid the administrative regulation adopted by the Administrator. To permit the industry to stand with no regulation would defeat the intent of Congress;

Act to the respondents. However, in the exercise of our administrative discretion as to the remedy most appropriate in the circumstances, we find that it will best effectuate the policies of the Act if the provisions in our Order, that the respondents reimburse employees for dues checked off from their wages on behalf of the Independent and make whole the discriminatorily discharged employees for any loss of earnings on their part, are limited to the period since June 2, 1942, the date on which the complaint herein was issued, since upon the issuance of the complaint the respondents were placed on notice that the Board's prior administrative determination was no longer in effect." (pp. 112, 113.)

11. At page 202, of 332 U.S., and at page 1580 of 67 S.Ct. the court said: "Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rulemaking powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct within the framework of the Holding Company Act [15 U.S.C.A. § 79 et seq.]. The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. * * * Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency. * * * That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law."

to permit the regulation declared invalid to apply as to past transactions was impossible, and the only alternative was to direct a retroactive imposition of a regulation otherwise proper.

No such dilemma faced the Board in the present case. At least it had the opportunity to adopt as an administrative decision the determination that under the circumstances it would be inequitable to enforce sanctions against this respondent.

Before considering whether the distinction just mentioned warrants a departure from the doctrine of the Chenery case, we must inquire what is the effect of the enactment of the Administrative Procedure Act, 60 Stat. 237, 918, 993, (1946); 61 Stat. 37, 201, (1947); 62 Stat. 99, (1948). § 2 of the Act, Title 5, U.S.C.A. § 1001, subdivision (c), defines "Rule" as follows: "(c) 'Rule' means the whole or any part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing upon any of the foregoing. 'Rule making' means agency process for the formulation, amendment, or repeal of a rule."

Section 3 requires that the agency affected shall publish in the Federal Register "(3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served

upon named persons in accordance with law. No person shall in any manner be required to resort to organization or procedure not so published." Title 5, § 1002.[12]

■ For reasons hereafter indicated we think it unnecessary to decide whether this requirement that "statements of general policy" must be published in the Federal Register before they may be imposed upon any individual, should be applied to the present situation. We think its prime significance is its indication of Congressional intent to put limitations upon the exercise of administrative power. We have no doubt that in exercising its certification functions, the Board could be undertaking such proceedings in an industry in respect to which it had previously declined to act without any formal announcement of a change of policy. In certification proceedings the action of the Board necessarily has future effect only. When it comes to adjudication of charges incorporated in a complaint designed to apply sanctions because of alleged unfair labor practices, the question is whether the Board could apply a policy rule which had not been published by it prior to the commission of the acts complained of.

■ The order under review here, which is made to apply retroactively to the acts performed by respondent, takes the form of an adjudication.[13] Courts, in making ad hoc adjudications, regularly apply rules and doctrines not previously announced, to prior conduct of the parties.[14] On occasions they have chosen to exercise an inherent power to give their pronouncements prospective operation only,[15] but they are not required by any constitutional limitation to do so, and they ordinarily do not. We assume that an adjudication by an administrative board is likewise not limited

---

12. It is noted that although "statements of general policy" are grouped with "substantive rules" in section 3(a), Title 5, § 1002(a), relating to publication in the Federal Register, "general statements of policy" are excluded from the requirement in § 4(a), Title 5, § 1003(a), for notice of proposed rule making.

13. Compare Administrative Procedure Act § 2(c) with § 2(d), Title 5, § 1001(c) and (d).

14. See discussion in Great Northern Ry. v. Sunburst Co., 1932, 287 U.S. 358, at page 364, 53 S.Ct. 145, 77 L.Ed. 360, and in Davis, Administrative Law, §§ 60 and 61.

15. See Gelpcke v. Dubuque, 1 Wall. 175, 68 U.S. 175, 17 L.Ed. 520, and other cases cited in Great Northern Ry. v. Sunburst Co., supra, 287 U.S. 358, 53 S.Ct. 145, note 14.

to prospective operation only by any fundamental requirement of due process.

But in determining the impact of statutory limitations upon agency action, substance is more important than form. Thus, in Philadelphia Co. v. Securities & Exchange Com'n, 82 U.S.App.D.C. 335, 164 F.2d 889, certiorari denied 333 U.S. 828, 68 S.Ct. 452, 92 L.Ed. 1113, a ruling of the Commission labeled as the making of a rule, was held, in view of its actual operation, to be an adjudication, or order, subject to review.[16] And in Western Air Lines, Inc. v. Civil Aeronautics Board, 9 Cir., 194 F.2d 211, this court held that a requirement of that Board, labeled a "condition", was, in the special circumstances there involved, in substance a mandatory order for a hearing, which we held must be in conformity with the hearing safeguards prescribed by the Administrative Procedure Act. So here, whether we are dealing with an administrative declaration which is required to have prospective effect only, should be judged on the basis of the realities of the situation, and not from the mere form by which the new policy is manifested.

We think it apparent that the practical operation of the Board's change of policy, when incorporated in the order now before us, is to work hardship upon respondent altogether out of proportion to the public ends to be accomplished. The inequity of such an impact of retroactive policy making upon a respondent innocent of any conscious violation of the act, and who was unable to know, when it acted, that it was guilty of any conduct of which the Board would take cognizance, is manifest. It is the sort of thing our system of law abhors.[17]

Nor is the retroactive reversal of policy, which took place here, any less abhorrent than that which the Board undertook to avoid in the C. A. Braukman matter, supra. The prior policy of not assuming jurisdiction in matters affecting the construction industry was so fixed and so notorious that we cannot perceive that respondent was any less taken by surprise than it would have been had the prior ruling occurred in a matter concerning this very respondent.

Notwithstanding that we have these views of the Board's action, there still remains the question whether the scope of review of that order in this court is such that we may decline to enforce it. The facts are not in dispute, and this is not a case in which the court has to consider the "substantial evidence" rule which was dealt with in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Primarily our concern is whether this court is permitted to substitute its judgment for that of the Board, and whether, if the court has a power to exercise an independent judgment, it ought to do so in this particular case.

The statutory language defining the scope of our review is found in subsection (e) of § 10 of the Administrative Procedure Act, Title 5, § 1009(e).[18] It is in this sec-

---

16. For the subsequent history of that matter, see 84 U.S.App.D.C. 73, 175 F.2d 808, and 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715.

17. In Gelpcke v. Dubuque, supra, 1 Wall. 175, note 15, the court refused to follow the ruling of the Supreme Court of Iowa that the State's constitution made invalid the municipal bonds there in suit, because, when the bonds issued, the Iowa court had made a contrary ruling. In thus departing from the ordinary rule, even then in effect, that a State's construction of its own constitution would be binding upon a federal court, Mr. Justice Swayne was moved to say, for the court: "We shall never immolate truth, justice, and the law, because a state tribunal has erected the altar and decreed the sacrifice."

18. "(e) So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to

tion that the court is directed to "hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law * * *."

It is to be noted, however, that under § 10 of the Act, all rights of review are subject to the qualifications stated in the first sentence, as follows: "Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion."

Unquestionably, if the agency action here involved was "not in accordance with law", it would be within our power and duty to say so. We have previously suggested that notwithstanding the reference in subdivision (a) (3) of § 3 of the Administrative Procedure Act to "statements of general policy" and the requirement that such must be published in the Federal Register, we deem it unnecessary to determine here whether the Board was required to publish notice of its new policy in the Federal Register. The significance of that provision is rather that in enacting that section "Congress expressed a mood", to borrow an expression from the Universal Camera case, supra [340 U.S. 474, 71 S.Ct. 463]. The mood was one of disapproval of the application of agency policies to persons who acted without an opportunity to know that such policy would be applied to their conduct. The mood was one of disapproval of retroactive agency action.

In a number of cases a commission's or board's interpretation of the proper application of law to admitted facts has been held a matter exclusively for the determination of the board or commission and within its

discretion so long as the interpretation has "warrant in the record" and a "reasonable basis in law". Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; S. E. C. v. Chenery Corp., supra; N. L. R. B. v. Hearst Publications, 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170. In other cases, not easily distinguished from those here cited, the Supreme Court, whether disagreeing with the agency's determination, Davies Warehouse Co. v. Bowles, 1944, 321 U.S. 144, 64 S.Ct. 474, 88 L.Ed. 635, or agreeing with the decision of the board or commission, Railroad Board v. Duquesne Co., 1946, 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192; Otis & Co. v. S. E. C., 1945, 323 U.S. 624; S. E. C. v. Central-Illinois Corp., 1949, 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836, has proceeded to exercise its own independent judgment upon the question determined by the agency's order.[19]

Specifically the question before us now boils down to this: Is the action represented by the Board's order, which we are now asked to enforce, one which is "by law committed to agency discretion", or is it one which we are charged with holding unlawful if we find it to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law?" If we were dealing here with a determination by the Board as to which policy in general ought to be applied to the construction industry, it would be clear that that is the type of action which the law commits to agency discretion. But here the problem is whether the policy, which the Board admittedly had the right to adopt, should be applied retroactively to this particular respondent.

When an agency's determination, whether of fact, or of law, relates to physical or economic facts, with respect to which the agency's experience is calculated to give it special competence, there is reason for assuming that the determination should, so far as possible, be regarded as within the

the requirements of sections 1006 and 1007 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the

whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

19. These and other cases are analyzed in Davis, Administrative Law, §§ 246, 247, 248.

discretion of the agency. The matter now before us, we apprehend, is not one of that kind. We deal with a problem which courts have frequent occasion to consider and upon which we think it cannot be said that the board or commission has superior opportunity for knowledge. For this reason we conclude that the agency action here is not by law committed to agency discretion and we are obliged to determine on this review whether such action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

We cannot but conclude that so much of the order as requires Hewes' reinstatement was agency action which we are directed by § 10 of the Administrative Procedure Act to set aside as arbitrary, capricious, and an abuse of discretion.

What we have said has no application to those portions of the order which operate prospectively, such as the order to cease and desist from recognizing Local 370, and from entering into any contract with it. But since the Board has informed us that Local 370 has now been certified as the bargaining representative, there is no longer any occasion for enforcement of this portion of the Board's order. And under the circumstances, the like directions to cease and desist from interference with the other union are inappropriate.

Accordingly, it is the judgment of the court that the petition for enforcement be denied.