**ATLAS TACK CORPORATION,**
Petitioner,

v.

**NEW YORK STOCK EXCHANGE et al.,**
Respondents.

No. 5180.

United States Court of Appeals
First Circuit.

June 3, 1957.

**312**

John H. Goewey, Pittsfield, Mass., and Dana C. Coggins, Vineyard Haven, Mass., Arthur T. Garvey, Springfield, Mass., on the brief for petitioner.

Thomas G. Meeker, Gen. Counsel, Washington, D. C., David Ferber, Asst. Gen. Counsel, and Joseph B. Gildenhorn, Atty., Washington, D. C., on the brief, for Securities and Exchange Commission, respondent.

A. Donald MacKinnon, New York City, Edward J. Reilly, Jr., Janet P. Kane and Milbank, Tweed, Hope & Hadley, New York City, on the brief, for New York Stock Exchange, respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by Atlas Tack Corporation, hereinafter called Atlas, for review of an order entered September 4, 1956 by the Securities and Exchange Commission, hereinafter called the Commission, granting the application of the New York Stock Exchange, hereinafter called the Exchange, to strike from listing and registration on the Exchange the capital stock of Atlas. Both the application by the Exchange to the Commission and the order entered by the Commission were made pursuant to Section 12(d) (48 Stat. 893, 15 U.S.C.A. § 78$l$(d))[1] of the Securities Exchange Act of 1934 and Rule X–12D2–1[2] promulgated thereunder by the commission.

Atlas, a corporation organized under the laws of the State of New York, is engaged in the manufacture of tacks, nails, rivets and similar products. Its capital stock was admitted to trading on the Exchange in 1920. It appears from the record that Atlas had 95,000 shares outstanding in 1920 and that its net tangible assets were $2,165,200.49 at that time.

---

1. Section 12(d) in pertinent part provides:
 " * * * A security registered with a national securities exchange may be withdrawn or stricken from listing and registration in accordance with the rules of the exchange and, upon such terms as the Commission may deem necessary to impose for the protection of investors, upon application by the issuer or the exchange to the Commission; whereupon the issuer shall be relieved from further compliance with the provisions of this section and section 13 of this title and any rules or regulations under such sections as to the securities so withdrawn or stricken. * * *"

2. This rule in pertinent part provides:
 * * * * "
 "(b) (1) An application by an issuer or an exchange to withdraw or strike a security from listing and registration pursuant to section 12(d) shall be made in accordance with the following requirements:
 * * * * *
 "(B) The application shall cite the paragraph designation of each provision of the constitution, bylaws or rules of the exchange, if any, which relates to such a withdrawal or striking, and shall set forth the steps taken by the applicant to satisfy the requirements of such provisions.
 "(C) The application shall state the reasons for such proposed withdrawal or striking, together with all material facts relating thereto and such facts as in the opinion of the applicant have a bearing on whether the Commission should impose any terms for the protection of investors. * * *"

Section 4 of Article XXXIII of the Constitution of the Exchange, in effect when Atlas was admitted to trading, provided: "The Governing Committee may suspend dealings in the securities of any corporation previously admitted to quotation upon the Exchange, or it may summarily remove any securities from the list." Moreover, upon receipt of Atlas' application to list its stock, the Exchange sent Atlas a printed document entitled "Committee on Stock List, New York Stock Exchange" which contained a heading, "Removals or Suspensions in Dealings of Listed Securities." Under this heading Atlas was apprised that "[w]henever it shall appear that the outstanding amount of any security listed upon the Stock Exchange has become so reduced as to make inadvisable further dealings therein, the Committee may direct that such security be removed from the list and further dealings therein prohibited."

Thereafter, the Exchange distributed the Company Manual, and supplements thereto, to all listed companies. One such document dated September 1, 1953 stated:

"  *      *      *      *      *

"Section 12(d) of the Securities Exchange Act of 1934 provides, among other things, as follows: 'A security registered with a national securities exchange may be withdrawn or stricken from listing and registration in accordance with the rules of the exchange and upon such terms as the Commission may deem necessary to impose for the protection of investors, upon application by the issuer or the exchange to the Commission;—'

*      *      *      *      *      *

"Removal from List or Suspension of Dealings by Action of Exchange

"Under the Constitution of the Exchange, securities, admitted to the list may be removed from the list, or dealings therein suspended, at any time.

"There follows a description of certain situations in which the Exchange, in accordance with its current policies and practices, will take action to delist all or part of an issue, class or series of a listed security. This description should not be regarded as limiting, in any way, the generality of the above-mentioned authority under the Constitution of the Exchange.

*      *      *      *      *      *

"*Small Amount Outstanding:* When, in the opinion of the Exchange, the amount of a listed security which remains outstanding in the hands of the public (exclusive of concentrated holdings), has been so reduced that, in the opinion of the Exchange, further dealings therein are inadvisable, the Exchange may, at its discretion, suspend dealings in such security and file application with the Securities and Exchange Commission, pursuant to Rule X–12D2–1 of the Commission, for withdrawal of the security from listing and registration.

"The point at which the Exchange may suspend dealings depends upon the circumstances of the particular case and, for that reason, it is impracticable to state, either in terms of specific amount or as a formula, the extent to which the amount of a security outstanding in the hands of the public may be reduced before the Exchange takes such action. However, under current practice, dealings generally are suspended, and a delisting application filed, when that amount is reduced to less than $200,-000 of aggregate market value, or when it is reduced to less than 2,-000 shares, in the case of a stock, or $200,000 principal amount in the case of a bond. *   *   *"

In July 1955 the Exchange adopted a policy to consider delisting any common stock issue of a company whose size had been so reduced as to make inadvisable further dealings therein. This

policy, set forth in a supplement to its Company Manual dated August 1, 1955 and distributed on August 15, 1955 to secretaries of all corporations whose securities were listed on the Exchange, stated:

"* * * * *

"*Limited Distribution of Shares or Small Size of Company:* The Exchange will also consider delisting any common stock issue in which the number of holders has fallen so far below original listing standards, or any common stock issue of a company whose size, as measured by aggregate market value of the issue or net tangible assets of the company, in conjunction with net earnings after taxes, has been so reduced, that continued dealings therein on the Exchange are considered inadvisable.

"In application of the above principles, the Exchange will consider delisting a common stock issue where:

"1. The total outstanding stock is held by less than 250 holders of record; or

"2. The size of a company has been reduced, as a result of liquidation or otherwise, to below $2,000,-000 in net tangible assets *or* aggregate market value of the common stock *and* the average net earnings after taxes for the last three years is below $200,000.

"No action by the company is required except for the furnishing of such information as the Exchange may request. The Exchange may hold a public hearing in connection with its consideration of suspension from dealings and filing an application with the Securities and Exchange Commission for removal of the security from listing and registration. * * * "

On October 20, 1955 the Exchange notified Atlas of a public hearing to be held on November 14, 1955 to consider the advisability of making an application to the Commission for removal of Atlas' stock from listing and registration on the Exchange. At the hearing, before representatives of the Exchange, it was found that the approximate market value of Atlas' outstanding stock as of November 11, 1955 was $1,334,500; that the approximate market value of Atlas' total stock as of November 11, 1955 was $1,396,500; that the volume of trading on the Exchange in Atlas stock was 10,300 shares in 1953, 5,400 shares in 1954 and 3,300 shares for an eleven months period ending November 14, 1955; that Atlas' net tangible assets, as of September 30, 1955, were $1,342,397 and its net earnings, after federal taxes, had not exceeded $200,000 in any of the past ten years, with the exception of 1955, when, as a result of a carryover of previous losses, it had a net profit of about $261,000.[3]

On December 15, 1955, after due consideration of the facts and statements presented at the hearing, the Board of Governors of the Exchange determined under the policy of the Exchange that Atlas' stock should be removed from the list of the Exchange and directed that an application to delist be filed with the Commission. On December 27, 1955 the Exchange suspended trading in Atlas stock and on January 17, 1956 it filed its application to delist with the Commission.

After appropriate notice a hearing was held before a hearing examiner of the Commission on April 9 and April 23, 1956. On June 7, 1956 the examiner filed his recommended decision that the Commission should grant the application to delist without the imposition of terms. Subsequently, exceptions to the recommended decision were filed by Atlas and oral argument was held before the Com-

3. Atlas' capital stock as of April 1956 consisted of 93,651 shares, owned by 312 stockholders. Of these total shares, two pension funds, Springfield Republican Daily News Employees' Beneficial Fund and the Springfield Union Employees' Beneficial Fund, are the beneficial owners of 74,238 shares.

mission. The Commission made an independent review of the record and on September 4, 1956 issued its findings, opinion and order granting the Exchange's application to strike from listing and registration the capital stock of Atlas without the imposition of terms.

Atlas contends that the delisting was improper and asks us to set aside the order of the Commission. Its argument generally seems to be twofold. First it asserts that the Exchange has not complied with its own rules of delisting. Second it urges that the Exchange standard for continued listing, adopted in July 1955, relating to earnings of the previous three years was applied retroactively to it.

After a careful study of the record and briefs we believe, for reasons detailed below, that the Commission was correct in granting, without terms, the Exchange's application, pursuant to Section 12(d), to strike from listing the stock of Atlas.

█ Section 12(d) expressly provides that a security registered with a national securities exchange may be stricken from listing and registration in accordance with the rules of the exchange and with such terms as the Commission may deem necessary for the protection of investors, upon application by the exchange to the Commission. Thus, it has been held that, in considering applications to delist under Section 12(d), the Commission has two functions to perform:

(1) To determine whether the rules of the exchange, effective at the time the application is filed, have been complied with; and

(2) To determine what terms, if any, are necessary for the protection of investors.

See the Torrington Company, 19 S.E.C. 39 (1945); Fuller Manufacturing Company, 14 S.E.C. 895 (1943); The Troxel Manufacturing Company, 9 S.E.C. 665 (1941); National Union Radio Corporation, 5 S.E.C. 397 (1939); Application of the New York Stock Exchange, etc., 5 S.E.C. 449 (1939). This has been the consistent administrative construction and is in accord with the normal meaning of the statutory language.

█ In the instant case the Commission applied the above principle and correctly concluded that the Exchange had complied with its rules. The standard or rule of the Exchange for continued listing of common stock, adopted in July 1955 and effective at the time the Exchange's application for delisting was filed, provided for delisting when "[t]he size of a company has been reduced, * * * to below $2,000,000 in net tangible assets or aggregate market value of the common stock and the average net earnings after taxes for the last three years is below $200,000." Atlas failed to meet this standard. While the aggregate market value of petitioner's stock exceeded $2,000,000 in 1950,[4] it had been reduced to $1,396,500 as of November 11, 1955. And, while the balance sheet as of June 30, 1920 showed net tangible assets of $2,165,200.49, Atlas' net tangible assets did not equal $2,000,000 in any year during the last ten years. Moreover, Atlas had substantial losses for the three years, 1952, 1953 and 1954, prior to the adoption of this standard.

In passing, since we believe that the Commission correctly found that the aggregate market value of Atlas' stock was "reduced" to below $2,000,000, we find it unnecessary to rule on Atlas' contention that the word "reduced" must be construed as precluding delisting of the

4. The Commission found that the aggregate market value of Atlas' stock "declined from in excess of $2,000,000 in various prior periods to approximately $1,300,000 on November 11, 1955." Atlas now claims that this finding is not supported by substantial evidence on the record. We disagree with this claim. The record shows that in 1950 petitioner's stock sold as high as 31¾. The record also shows that 95,000 shares were outstanding in 1920, when petitioner's shares were listed, and that 93,651 shares, exclusive of treasury shares, were outstanding in 1955; there is no indication in the record and Atlas does not contend that the number of shares outstanding was ever substantially less.

stock of companies which have never equalled or exceeded $2,000,000, a construction which the Commission thought "would clearly seem to run counter to the objective of the Exchange to limit its facilities to securities of companies in which there is a substantial public investor interest."

■ The Commission, having found that the Exchange had complied with its rules, had no power to deny the Exchange's application for delisting under Section 12(d) even "if for some acceptable reason" it believed that trading in Atlas' stock should be continued. Allen Industries, Inc., 2 S.E.C. 14, 17 (1937). Section 12(d) has been construed, and we believe properly so, as making it mandatory upon the Commission to grant applications for delisting if the rules of the exchange have been followed. Application of the New York Stock Exchange, Etc., 4 S.E.C. 723 (1939). Once the Commission finds the aforementioned compliance its "sole remaining function is to determine whether delisting should be accompanied with any terms necessary for the protection of investors." Application of the New York Stock Exchange, Etc., supra [5 S.E.C.] at 455. See also Standard Silver-Lead Mining Company, et al., 25 S.E.C. 287 (1947); Lincoln Service Corporation, 15 S.E.C. 17 (1943); National Union Radio Corporation, supra.

■ On the issue of terms, we note that Atlas does not suggest to this court what terms it believes would have been appropriate for the Commission to have imposed in the instant case; rather, it asks us to set aside the order of the Commission. However, it is clear that the Commission fully considered the matter of terms and decided that there was no basis for imposing them in this case. It appears from the cases brought to our attention that the Commission has never imposed terms upon a delisting application by an exchange, as distinguished from an issuer, except to postpone the effective date of delisting for a short period of time. In Application of the New York Stock Exchange, Etc.,

supra [4 S.E.C.] at 726, the Commission, recognizing that there were certain disadvantages in having a security delisted, states:

"* * * delisting might have an adverse effect on present investors. But these consequences are inherent in any delisting and no unusual circumstances were shown which would make these factors grounds for the imposition of conditions in this case. These disadvantages, moreover, should be weighed against the protection afforded future purchasers by removing from exchange trading securities which may not be suitable for that market. The Exchange considers the present security unsuitable because its minus asset value may be overlooked by purchasers who consider listing on the New York Stock Exchange a hallmark of value and further because the small market value of the shares available for trading makes the stock unusually susceptible to the exercise of improper pressures."

Similar opinions were expressed by the Commission in Application of the New York Stock Exchange, Etc., supra [5 S.E.C. 449] and in Applications of the New York Stock Exchange, Etc., 4 S.E.C. 754 (1939).

Furthermore, this court has previously stated "that the Commission has wide discretion in the choice of what 'terms' it shall impose for the protection of investors, and ordinarily a court should not undertake to substitute its judgment of what would be appropriate terms for the administrative judgment." Shawmut Ass'n v. Securities and Exchange Comm., 1 Cir., 1945, 146 F.2d 791, 796. The same reasoning is applicable when the Commission has decided, as here, that it is not necessary to impose any terms.

■ Now we come to Atlas' contention that the Exchange standard for continued listing, adopted in July, 1955, relating to earnings of the previous three years was retroactive in nature as applied to it. This argument, it seems to

us, strikes at the propriety or reasonableness of the standard or rule of the Exchange. Atlas is asking this court, as it asked the Commission, to change or void the rule of the Exchange in question in a proceeding brought under Section 12(d) to delist its capital stock. It seems to us that the Commission has no authority to do this in a Section 12(d) proceeding. The Commission's authority over the delisting rules of an exchange seems to be in a proceeding pursuant to Section 19(b) (3) (48 Stat. 898, 15 U.S. C.A. § 78s(b) (3) ) of the Act.[5] See The Torrington Company, supra at 53.

In Allen Industries, Inc., supra at 18, the Commission, in considering its supervisory authority with respect to Section 12(d) and Section 19(b), compared the two sections, stating:

" * * * Section 12(d) plainly contemplates the possibility that the listed and registered status of a security can be terminated in a way so abrupt as to be unfair to security holders. It, therefore, empowers the Commission to impose conditions necessary for the protection of security holders against action taken by an issuer and an exchange, or by an exchange itself, which, if abrupt, sudden, or in violation of accepted procedures, may unduly injure investors. But it clearly contemplates that the continuance of the listed status of a security (a status upon which its quality of being a registered security depends) shall, as heretofore, be a matter whose primary control is in the hands of the issuer and the exchange. * * * Section 19(b) * * * authorizes the Commis-

sion, after appropriate procedural steps, to impose upon exchanges, as rules of the exchanges, such rules as the Commission deems necessary for public protection with reference to a variety of matters. Among these matters are 'the listing or striking from listing of any security.' The way in which this section complements the procedure set forth in Section 12(d) is obvious. If the protection there accorded the public is inadequate due to faulty rules or procedures of exchanges, the remedy lies in a correction of these rules and procedures by the method set forth in Section 19(b). * * * "

It is clear that a request for a change in the rules of the Exchange should have been brought in a proceeding under Section 19(b) and not in a proceeding under Section 12(d), as was done in the instant case. Under the latter section the Commission merely has to decide whether the rules of the exchange, effective when the application for delisting is filed, have been complied with and whether terms are necessary for the protection of the investors; it does not have the power to inquire as to the reasonableness or propriety of the rules.

But since the Commission here specifically considered this issue, concluding that there was "no objectionable retroactive feature in the Exchange's delisting standards," we too will consider it. Atlas argues that prior to 1955 the Exchange's policy as expressed in its delisting standards, set forth above, made no reference to average net earnings; that, in reliance on this known and existing policy, it opened and operated, at the request of the United States

5. Section 19(b) (3) in pertinent part provides:
"(b) The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, the Commission determines that such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange (insofar as necessary or appropriate to effect such changes) in respect of such matters as * * * (3) the listing or striking from listing of any security; * * * ."

Government, a magnesium foundry at Hingham, Massachusetts; that its losses in 1952, 1953 and 1954 were due to this operation. It further argues that, if it had known its failure to earn at least $200,000 in each of the years 1952, 1953 and 1954 would later jeopardize its right to have its securities listed on the Exchange, it would not have undertaken the aforementioned expansion. In the manner outlined above Atlas concludes that the portion of the Exchange's delisting standard concerning past earnings, adopted in July 1955, was retroactively applied to it and that it did not have any opportunity to meet the new standard.

As support for its contention that the July 1955 standard is improper and unreasonable it cites cases that stand for the proposition that a change in administrative policy cannot be applied retroactively. e. g. National Labor Relations Bd. v. Guy F. Atkinson Co., 9 Cir., 1952, 195 F.2d 141. The Exchange and the Commission, on the other hand, argue that "[a] statute [the Exchange rule or standard in this case] is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." e. g. Reynolds v. United States, 1934, 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353; Neild v. District of Columbia, 1940, 71 App.D.C. 306, 110 F.2d 246. The Exchange and the Commission further argue that an exchange, which is a private organization but subject to regulation because affected with a public interest, is not comparable to an administrative agency of the government and that the rules of securities exchanges are not comparable to those of an administrative agency.

Although we have serious doubts as to whether the rule in question is a retroactive one as applied to Atlas, even conceding its retroactivity we do not believe it is objectionable. As the Commission in the instant case stated, "[c]orporations whose stock is listed, and the holders of such stock, are bound to recog-

nize that listing is not a vested right which may not be terminated despite changes in the importance of the company and its stock in the investment community. Past earnings performance is one of the factors affecting investment standing, and we cannot find that its use by the Exchange, which has the primary responsibility for the determination of appropriate standards for appraising the suitability of securities for continued listing, as one of the tests of the need for continued access to the Exchange's market is inappropriate or affords any basis for not granting unconditional approval of the applications." We believe that any retroactive effect of the instant rule should be weighed against the protection afforded present and potential investors by delisting securities not suitable for trading on the Exchange. In Securities and Exchange Comm. v. Chenery Corp., 1947, 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995, the Supreme Court approved a retroactive action by the Commission, stating:

> "* * * That such action might have a retroactive effect was not necessarily fatal to its validity. * * * But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law."

As was testified by the vice president of the New York Stock Exchange, the "Exchange has developed historically as the nation's foremost auction market for securities. Today, it stands as a national and international market for securities of well-established companies in which there is a broad public interest. * * * [M]aintenance of such a quality market for securities is in the interest of the investing public, including not only present, but prospective investors. The Exchange's standards for orig-

inal listing, developed over the years on an evolutionary basis, have been designed to continue such a quality market.[6] * * * Standards for original listing by themselves cannot maintain the quality of the * * * Exchange's market in securities. They must be supplemented by standards for delisting which apply to the list as a whole, regardless of when any particular issue may have been originally listed. * * * The Exchange's standards for delisting have been developed over a number of years, and as the standards for original listing have been revised upwards, the standards for delisting have been increased. The Exchange's listing and delisting standards are, and necessarily must be based upon the experience and judgment of the Exchange acting through its Board of Governors."

In furtherance of the objectives discussed above, the delisting standard in question was adopted by the Exchange in accord with its powers under Section 6(c) (48 Stat. 887, 15 U.S.C.A. § 78f(c)) of the Act.[7] It is clear from the facts that Atlas and other listed companies had been advised throughout the years of the Exchange's policy to maintain its quality market by controlling its delisting standards. Under such circumstances Atlas could not and should not have relied on any particular prior standard as assuring it of a continuing listed status.

Although we can understand Atlas' concern over the disadvantages inherent in delisting, we cannot set aside a standard that has been adopted in good faith by the Exchange with the purpose of assuring a quality market to the general public. Moreover, the Commission has concluded that this standard is not ob-jectionable. We believe that "[t]he Commission's conclusion here rests squarely in that area where administrative judgments are entitled to the greatest amount of weight by appellate courts. * * * It is the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process. * * *" Securities and Exchange Comm. v. Chenery Corp., supra, 332 U.S. at page 209, 67 S.Ct. at page 1583.

A judgment will be entered affirming the Commission's order.

---

6. Indeed it might be noted in this connection that the Exchange's guides for original listing are presently:

    1. Aggregate market value of the common stock in excess of seven million dollars.

    2. Net tangible asset values of at least seven million dollars.

    3. Demonstrated earning power of one million dollars annually after all charges, including taxes.

7. Section 6(c) provides:

    "(c) Nothing in this title shall be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with this title and the rules and regulations thereunder and the applicable laws of the State in which it is located."