**BRANIFF MASTER EXECUTIVE COUNCIL OF the AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Eastern Air Lines, Inc., Intervenor.**

**No. 82–1482.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1982.

Decided Nov. 19, 1982.

As Modified on Denial of Rehearing Jan. 10, 1983.

---

**124.** *Id.* at 492–93.

Daniel M. Katz, Washington, D.C., for petitioner.

Mark W. Frisbie, Atty., C.A.B., with whom William F. Baxter, Asst. Atty. Gen., Ivars V. Mellups, Acting Gen. Counsel, Thomas L. Ray, Acting Associate Gen. Counsel, C.A.B., John J. Powers, III, and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondent. Alan R. Demby, Atty., C.A.B., Washington, D.C., also entered an appearance for respondent.

Robert N. Duggan, Washington, D.C., for intervenor, Eastern Air Lines, Inc.

Before MacKINNON and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Following a practice the Interstate Commerce Commission developed in railroad consolidation cases,[1] the Civil Aeronautics Board (CAB or Board) historically has conditioned approval of airline route transfers and mergers upon carrier acceptance of terms mitigating hardship to employees. *See United-Capital Merger Case,* 33 C.A.B. 301, 323 (1961); *North Atlantic Route Transfer Case,* 14 C.A.B. 910, 916–19 (1951); *United Western, Acquisition of Air Carrier Property,* 11 C.A.B. 701, 707–08 (1950), *aff'd sub nom. Western Air Lines v. CAB,* 194 F.2d 211 (9th Cir. 1952). Such terms, known as labor protective provisions (LPPs), may include displacement compensation, integration of seniority lists, and mandatory arbitration of disputes. *See Delta-Northeast Merger Case,* 59 C.A.B. 608, 640–45 (1972); *Allegheny-Mohawk Merger Case,* 59 C.A.B. 22, 31–40 (1972); *United-Capital Merger Case,* 33 C.A.B. 307, 342–47 (1961).[2] The Board's objective in

---

1. For the history of labor protective arrangements in the railroad context, see *Railway Labor Executives' Ass'n v. United States,* 675 F.2d 1248, 1250–51 (D.C.Cir.1982); *New York Dock Ry. v. United States,* 609 F.2d 83, 86–90 (2d Cir. 1979). This practice was endorsed by the Supreme Court in *United States v. Lowden,* 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939).

2. Standard LPPs were summarized in the Allegheny-Mohawk Merger Case, 59 C.A.B. 22, 31–32 (1972):

> [I]n the case of a merger the surviving carrier must—
>
> (1) Provide for the fair and equitable integration of seniority lists;
>
> (2) In regard to any employee who continues on in the employment of the carrier, pay a "displacement allowance" to that employee for up to 4 years, to the extent that the employee is "placed in a worse position with respect to compensation" as a result of the merger;
>
> (3) Pay a "dismissal allowance" to any employee who loses his job as a result of the merger. For dismissed employees with 15 years of service with either of the merger partners, payments continue for 5 years after the discharge; employees with less seniority receive payments for a commensurately shorter period. At the employee's option, a lesser amount can be taken in a lump sum;
>
> (4) Continue, for a stated period, fringe benefits, such as hospitalization insurance, to employees affected by the merger;
>
> (5) Compensate employees who as a result of the merger have to change their place of residence;
>
> (6) Arbitrate disputes with employees arising under the labor protective provisions.

imposing LPPs has been to ward off labor strife that could impede or delay a route transfer or merger, or detrimentally affect a carrier's stability or efficiency. *Kent v. CAB,* 204 F.2d 263, 265 (2d Cir.), *cert. denied,* 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351 (1953); *Western Air Lines v. CAB,* 194 F.2d 211, 214 (9th Cir. 1952).

This case concerns the Board's handling of LPPs in an urgent setting. In April 1982, when Braniff Airways, Inc. (Braniff) was still afloat but in dire financial straits, the CAB, meeting in an emergency session, granted interim approval for the transfer of most of Braniff's South American routes to Eastern Air Lines, Inc. (Eastern). The Board set a fifteen-month period as the duration of the temporary authority. It decided not to impose LPPs at that time, but said it would consider the issue in the hearing on long-term authorization and might then impose LPPs retroactively. *Eastern Air Lines Application,* Order 82–4–144 at 4 n. 4 (April 27, 1982), Joint Appendix (J.A.) 150.

Braniff Master Executive Council (BMEC), an organization representing former Braniff pilots,[3] has petitioned this court to set aside the Board's interim order approving the Eastern/Braniff agreement for a fifteen-month period, to the extent that the order fails to include LPPs. In light of the unprecedented circumstances in which the Board acted, we hold that initial deferral of the LPP issue was reasonable. We further hold, however, that the Board impermissibly prolonged the deferral period and must now expedite resolution of this matter.

BACKGROUND

Beginning in March 1982, financially-distressed Braniff sought to sell its South American route network in an effort to gain needed funds that might enable it to survive as a domestic air carrier.[4] On March 17, 1982, Braniff agreed to lease its South American routes, ground equipment, and facilities to Pan American World Airways, Inc. (Pan Am) for four years at a price of $30 million. That same day, the two airlines submitted their agreement to the CAB for approval, pursuant to section 412 of the Federal Aviation Act, a section generally applicable to air carrier agreements.[5] On April 2, 1982, Braniff and Pan

---

**3.** BMEC is affiliated with the Air Line Pilots Association, International, and appears here to assert the interests of approximately 200 Braniff pilots who lost their jobs when Eastern took over Braniff's South American routes. Brief of Petitioner at 6–7. At oral argument, BMEC's counsel confirmed that the Air Line Pilots Association, International, also represented Eastern's pilots, flight engineers, and second officers. *See also* Reply Brief of Petitioner at 26–27 (the Air Line Pilots Association has a mandatory merger policy which would facilitate seniority list integration between the 200 BMEC pilots and nearly 5000 Eastern pilots).

**4.** The Braniff South American network included service from the United States to Argentina, Bolivia, Chile, Columbia, Ecuador, Panama, Paraguay, and Peru. Braniff did not attempt to sell its routes to Brazil or Venezuela because of pre-existing treaty arrangements with those countries.

**5.** Section 412, 49 U.S.C. § 1382, captioned "Pooling and other agreements," provides in relevant part:

 (a) Filing and approval of agreements. (1) Any air carrier or foreign air carrier may file with the Board a true copy, . . . of any contract or agreement . . . or a request for authority to discuss possible cooperative working arrangements in force on the effective date of this subsection, or thereafter entered into, or any modification or cancellation thereof, between such air carrier or foreign air carrier and any other air carrier, foreign air carrier, or other carrier.

 (2)(A) The Board shall by order disapprove any contract, agreement, or request filed pursuant to paragraph (1) of this subsection, whether or not previously approved by it, that it finds to be adverse to the public interest or in violation of this Act, and shall by order approve any contract, agreement, or request, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this Act, except that—

 (i) the Board may not approve or, after periodic review, continue its approval of any such contract, agreement, or request, or any modification or cancellation thereof, which substantially reduces or eliminates competition, unless it finds that the contract, agreement, or request is necessary to meet a serious transportation need or to secure important public benefits, including international comity or foreign policy considerations, and it does not find that such need can be met or

Am asked the CAB not to condition approval of the agreement on the inclusion of LPPs; they represented that "if Braniff had to bear the burden of payment, the benefits of the Agreement [to Braniff] would evaporate," and the arrangement negotiated would cease to make "economic sense for Pan Am if [that carrier] were saddled with LPPs." J.A. 214. Pan Am did agree, however, to take on all of Braniff's South American-based ground personnel.

Just over a month after the submission, the CAB denied interim approval of the Pan Am/Braniff agreement. The Board determined that transfer of Braniff's routes to Pan Am "would reduce actual competition in certain South American markets and would essentially leave Pan Am as the sole U.S.-flag carrier in South America, thus reversing the United States' policy for 30 years of assuring that at least two U.S. carriers maintain a substantial presence in South America." *Braniff-Pan American Route Transfer Case,* Order 82–4–113 at 4 (April 20, 1982), J.A. 264. The Board noted it had considered the agreement under section 408 as well as 412 of the Federal Aviation Act; section 408 applies to mergers, consolidations or purchases of substantial portions of a carrier.[6] The Board further announced it was prepared to consider expeditiously alternative agreements for the disposition of Braniff's South American network. *Id.* at 4–5, J.A. 264–65.

The CAB's rejection of the Pan Am/Braniff submission set off a flurry of activity. Braniff faced a forecasted negative cash situation in South America as early as April 27, 1982. Cessation of service on Braniff's South American routes was an attendant prospect. The threat of a break in U.S.-flag service to certain South American countries prompted President Reagan, on April 23, 1982, to write to CAB Chairman McKinnon, urging that the Board "immediately take all necessary steps . . . to ensure that U.S. carrier service continues without interruption on all Central and South American routes served by Braniff." J.A. 275. Meanwhile, Braniff sought to attract another carrier to an arrangement that would assure unbroken operation of the South American network.

On April 26, 1982, one day before Braniff had threatened to stop its South American flights, Braniff and Eastern submitted an agreement to the CAB patterned on the

such benefits can be secured by reasonably available alternative means having materially less anticompetitive effects . . . .

This section, and not the more restrictive section 408, *see infra* note 6, applies, *e.g.,* where two U.S.-flag carriers agree to transfer temporarily international routes. *Northwest Airlines, Inc. v. CAB,* 539 F.2d 748, 752 (D.C. Cir. 1976). *See also United Air Lines Transp. Corp. & W. Air Express Corp.,* 1 C.A.B. 723, 727 (1940) (section 412 applies to a contract or lease "involving something less than a substantial part of the properties of any carrier"; section 408 applies if a substantial part is involved).

**6.** Section 408, 49 U.S.C. § 1378, provides in relevant part:

(a) Prohibited acts. Except as provided in subsection (b) of this section, it shall be unlawful—

(1) for two or more air carriers, or for any air carrier and any other common carrier . . . to consolidate or merge their properties, or a substantial portion thereof, into one person for the ownership, management, or operation of the properties previously in separate ownerships;

(2) for any carrier, . . . to purchase, lease, or contract to operate all or a substantial portion of the properties of any air carrier;

. . . . .

(b) Power of board. (1) In any case in which one or more of the parties to a consolidation, merger, purchase, lease, operating contract, or acquisition of control, specified in subsection (a) of this section is an air carrier holding a valid certification issued by the Board . . . to engage in interstate or overseas air transportation, [or] a foreign air carrier, . . . the person seeking approval of such transaction shall present an application to the Board, . . . and thereupon the Board shall notify the persons involved in the transaction and other persons known to have a substantial interest in the proceeding, of the manner in which the Board will proceed in disposing of such application. Unless, after a hearing, the Board finds that the transaction will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall, by order, approve such transaction upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe . . . .

Pan Am/Braniff submission. Under this agreement, Braniff would lease its South American routes, ground equipment, and facilities to Eastern for six years at a price of $30 million. Upon the CAB's interim approval of the agreement, Eastern would immediately pay $11 million; a portion of this sum would be used to keep Braniff operating in South America until June 1, 1982, when Eastern would take over.[7] Eastern, like Pan Am in its earlier route-acquisition bid, rejected LPPs for Braniff's U.S.-based personnel, including pilots, but it did agree to hire all of Braniff's South American-based personnel, including flight attendants.[8]

Believing it confronted an emergency, the CAB convened to consider the Eastern/Braniff submission on the night of April 26 in a closed meeting. The meeting yielded interim approval of the agreement for a fifteen-month period. The next day, the Board issued an order granting the interim approval, citing Eastern's ability to take over the network without lessening competition. *Eastern Air Lines Application,* Order 82–4–144 at 3 (April 27, 1982), J.A. 149. The Board announced it was acting under section 412 of the Federal Aviation Act, but the similarity between the Pan Am/Braniff and Eastern/Braniff submissions suggests the Board's awareness that section 408 was applicable to the transaction. At oral argument, counsel for the CAB stated that the Board proceeded under section 408 as well as section 412.[9] The section 408 involvement is significant because Congress has instructed the Board to act on transactions under section 412 within twelve months, those under 408, within six months. 49 U.S.C. § 1490 (set out *infra* note 24).

The Board acknowledged the fifteen-month duration of the interim authorization was "longer than is usually provided for *pendente lite* exemptions." Order 82–4–144 at 4, J.A. 150. The CAB justified this unusual authorization as "essential to avoid an interruption of service to South America, to promote the United States' foreign aviation policy objectives in this region, and to preserve the Board's decisional flexibility in proceedings on long-term replacement authority." *Id.* Triggering the instant controversy, the Board decided not to impose LPPs at the outset, but to take up this issue later as part of a full hearing on permanent approval of the Eastern/Braniff agreement, with retroactive imposition of LPPs an eventual possibility. Order 82–4–144 at 4 n. 4, J.A. 150.

Three unions representing Braniff workers, including the Air Line Pilots Association, parent organization of BMEC, petitioned for reconsideration of the Board's April 27 order to the extent that it deferred the LPP issue.[10] In a September 22, 1982,

7. It was hoped, according to the CAB's counsel, that the $11 million payment would enable Braniff to continue operations as a domestic air carrier. But the hope failed. On May 13, 1982, approximately two weeks after the Eastern/Braniff agreement was approved, Braniff filed for reorganization in bankruptcy. For a review of Braniff's bankruptcy and its aftermath, see *Pan Am. World Airways, Inc. v. CAB,* 684 F.2d 31 (D.C.Cir.1982).

8. Eastern's acceptance of Braniff's South American-based flight attendants has been successfully challenged by the Transport Workers Union, representing Eastern's U.S.-based flight attendants. *Local 553, Transp. Workers Union v. Eastern Air Lines, Inc.,* 544 F.Supp. 1315 (E.D.N.Y. 1982). The district court issued a preliminary injunction which requires Eastern either to follow its seniority list in allocating flight attendants for South American flights or compensate those on the seniority list who would fly on those flights, but for Eastern's desire to use South American-based flight attendants. *Id.* at 1336. In this instance, protecting Braniff's employees exacerbated, rather than diminished, labor strife.

9. The CAB submitted to this court under seal the unexpurgated transcript of the April 26, 1982, closed meeting. Our *in camera* review of the transcript further confirms that the CAB granted interim approval pursuant to both sections.

10. The other petitioning unions were the International Association of Machinists and Aerospace Workers and Local 553 of the Transport Workers Union. Braniff S.Am. Route Transfer Case, Order 82–9–81 at 6 (September 22, 1982).

Earlier, on April 27, 1982, the day the CAB issued its initial order, BMEC petitioned the CAB to impose LPPs if it gave interim approval to the Eastern/Braniff agreement. The Board

order outlining procedures for determining whether the Eastern/Braniff agreement should achieve permanent approval,[11] the Board recognized, explicitly, that sections 408 and 412 of the Federal Aviation Act were both applicable. However, the CAB stated its time schedule would accord with the one-year limitation applicable to section 412 proceedings, rather than the six-month limitation governing section 408 transactions. *See Braniff South American Route Transfer Case,* Order 82–9–81 at 14 n. 22 (September 22, 1982). The Board also affirmed in the September 22 order its initial decision to defer consideration of LPPs. *Id.* at 15–17. This postponement, first announced in the Board's April 27 order and later affirmed in the CAB's September 22 order, is the core administrative determination challenged in BMEC's petition for review.

### DECISION

In addition to maintaining that the Board was required to impose LPPs from the outset, BMEC points to procedural infirmities

did not separately respond to this petition, but it is fair to assume that BMEC's petition was denied, along with the Air Line Pilots Association's petition for reconsideration, in the Board's September 22 order.

11. The Board agreed to consider as well a joint application by Pan Am and Air Florida, Inc., to take over Braniff's South American network. As indicated *infra* note 20, time did not permit Pan Am and Air Florida to reach an agreement with Braniff in late April 1982, but the Board noted "[s]ince our interim approval of the Braniff-Eastern agreement has provided time for more thorough consideration of issues raised by these applications, we believe that fairness requires that Pan Am and Air Florida be given an opportunity to be heard on the same basis as Braniff/Eastern." Braniff S.Am. Route Transfer Case, Order 82–9–81 at 14 (September 22, 1982).

The Board also dismissed, without prejudice, applications for certificates to service individual routes in the Braniff South American network filed by Air Florida, Eastern, American Airlines, Inc., Capitol Air, Inc., Earth Space Transport Systems Corp., Transamerica Airlines, Inc., and Western Air Lines, Inc. *Id.* at 13.

12. 684 F.2d at 36 & n. 11. BMEC contends it was harmed by the closed meeting because it

in the CAB's interim approval of the Eastern/Braniff transaction. BMEC contends (1) closing the April 26, 1982, meeting violated the Government in the Sunshine Act, 5 U.S.C. § 552b; (2) the Board indulged in impermissible ex parte contacts with Eastern and Braniff; and (3) the deferral of decision regarding permanent authorization violated time constraints Congress imposed on Board action. 49 U.S.C. § 1490.

 This court has already condemned the CAB's total closure of meetings such as the one the Board held on April 26, 1982. *Pan American World Airways, Inc. v. CAB (Pan Am),* 684 F.2d 31, 35–37 (D.C.Cir.1982). We need not repeat the stern admonition contained in that opinion. However, like the panel in *Pan Am,* we do not believe the agency decision here on review, if it constituted a reasonable response to an urgent situation, should be overturned because of the Sunshine Act violation. As the *Pan Am* panel observed, "release of transcripts, not invalidation of the agency's substantive action," is the remedy generally appropriate for disregard of the Sunshine Act.[12]

might have sought an emergency stay of the Board's April 27 order had it known what transpired at the meeting. This argument rings hollow, however, because BMEC did not even raise the Sunshine Act violation until its reply brief to this panel. In contrast, in *Pan Am,* both Pan Am and Delta Air Lines, Inc. filed emergency stay motions the day after the CAB's emergency, closed meeting. 684 F.2d at 34.

Further, as discussed more fully below, our *in camera* review of the unexpurgated transcript submitted to this court under seal persuades us that the CAB acted reasonably in deferring consideration of LPPs. *See id.* at 37 ("So long as the Board's awards … were reasonable, we do not feel they should be vacated because they were reached in closed session."). Our *in camera* review also reveals that the Board released to BMEC all discussion relating to LPPs, which took place during the closed meeting.

In view of BMEC's tardy request, and our ruling on the time frame for Board decision on LPPs, *see infra,* pp. 231–232, we do not address the question whether the CAB should now release the full transcript. BMEC, we note, might have applied to the district court for such relief within 60 days of the April 26 meeting. *See* 5 U.S.C. § 552b(h)(1).

■ Similarly, the ex parte contacts, impelled by Braniff's failing circumstances, did not so infect the Board's decision to defer consideration of LPPs as to warrant nullification of that decision. CAB officials reported at the April 26 closed meeting they had been in contact, over the weekend, with officials from Air Florida, Eastern, Western Air Lines, American Airlines, Pan Am, and Braniff, "just asking all of them as possible interested parties to keep [the Board] ... apprised of what was going on." J.A. 47–48. Chairman McKinnon also talked to Frank Borman, Eastern's top executive, and a Braniff official to get details of the forthcoming Eastern/Braniff agreement. J.A. 101–02. All of these contacts took place before Eastern submitted its formal agreement with Braniff to the Board. Given the emergency situation, we cannot fault the CAB for endeavoring rapidly to collect information needed for intelligent, albeit urgent, decisionmaking.

Further, the record indicates that Eastern's opposition to the imposition of LPPs, which was just as vehement as Pan Am's, appeared with clarity in its written submission to the Board. The ex parte contacts therefore did not give the Board any otherwise unstated information about the carriers' position on LPPs.[13] Since the contacts with Eastern officials, to the extent that they related to LPPs, did nothing more than reiterate what was evident on the face of the Eastern/Braniff agreement, the communications cannot be regarded as bearing significantly on the CAB's decision to defer the LPP issue. *See generally Sierra Club v. Costle,* 657 F.2d 298, 403 (D.C.Cir.1981) (relative significance of an ex parte communication to the eventual agency action is a factor in determining whether disclosure of the communication is required). In sum, neither the closed meeting, nor the ex parte contacts warrant upsetting the Board's decision against immediate imposition of LPPs.

We therefore turn to the two issues critical to our decision. First, did the Board act reasonably in deferring the LPP question, and second, did the Board defer too long?

1. *Immediate imposition of LPPs was not required by law or the CAB's past practice.*

BMEC argues that in route transfer and merger cases the CAB is bound by its historic practice to impose LPPs uniformly and at once. Further, BMEC contends, Congress implicitly endorsed mandatory inclusion of LPPs when it passed the Airline Deregulation Act of 1978. We find these arguments insubstantial.

■ No statute has ever required imposition of LPPs in air carrier mergers or route transfers. *Air Line Pilots Association v. CAB,* 494 F.2d 1118, 1129 (D.C.Cir.1974) (Board's power to impose LPPs is discretionary). Rather, Congress has broadly directed the CAB to rule on such transactions in a manner "consistent with the public interest." Federal Aviation Act, § 408(b), 42 U.S.C. § 1378(b); *see also id.,* § 412(a)(2)(A), 49 U.S.C. § 1382(a)(2)(A) (CAB must disapprove an agreement if it is "adverse to the public interest"). In the Airline Deregulation Act of 1978, Congress clarified that "the need to encourage fair wages and equitable working conditions"[14] ranks among several factors relevant to the

---

**13.** Eastern's Borman told Bureau of International Aviation staff member Kasper that imposition of LPPs on the Eastern/Braniff agreement "would queer the deal." J.A. 86. Chairman McKinnon was told of Borman's remark at the closed meeting and responded that "[i]t says that very clearly right in here [Eastern's submission to the Board]." *Id.* As reprinted *infra* note 19, a clause in the Eastern/Braniff agreement allowed Eastern an automatic right to terminate the agreement if the CAB conditioned its approval on the imposition of LPPs.

**14.** Section 102(a)(3), 49 U.S.C. § 1302(a)(3). This provision was extended in 1980 by the International Air Transportation Competition Act of 1979, § 2, to reach foreign air transportation, the category of travel involved in this case. Prior to 1980, the section applied only to interstate and overseas air transportation. The Federal Aviation Act defines "interstate" transportation as transportation between states, "overseas" transportation as transportation between any state and a territory or possession of the United States or between territories and possessions, and "foreign" transportation as

public interest. Congress instructed the Board to *consider* that need. A general instruction to consider wages and working conditions simply cannot be read as a command to the agency to impose LPPs routinely. Indeed, Congress spoke with precision in the Deregulation Act when it wanted the Board to take particular measures to aid airline employees. Most notably, section 43 of the Act establishes a comprehensive employee protection program to assist workers whose employment terminated as a direct result of airline deregulation.[15] Congress also limited recourse to mutual aid pacts, which airlines had used to tide a carrier over a strike.[16] In short, faced with specific statutory provisions responsive to labor interests, a court cannot force an agency to infer other, specific, labor protective commands from broad congressional language that suggests discretion more than direction.[17]

The Board acknowledges that historically it has imposed LPPs routinely in merger cases, Brief for Respondent at 22, but insists it has made clear that the overriding consideration is the "public interest," a standard that may require adjustment to changing conditions. *See Slick Airways, Suspension of Service,* 26 C.A.B. 779, 782 (1958) (labor protection is "only one element to be weighed against the numerous considerations that enter into a determination of the overall public interest"). The CAB points out that in the merger cases cited by BMEC, in which LPPs were imposed though one of the carriers was failing, the parties had agreed to the imposition. *See Delta-Northeast Merger Case,* 59 C.A.B. 608, 634 (1972); *United-Capital Merger Case,* 33 C.A.B. 307, 323 (1961). Never before, the CAB asserts, has it encountered a case such as this one, requiring rapid action in an attempt to rescue a failing carrier, in

transportation between any place in the United States and any place outside the United States. 49 U.S.C. § 1301(21).

**15.** 49 U.S.C. § 1552. Under this program, the Secretary of Labor is authorized to make monthly assistance payments to eligible "protected employees" who have lost their jobs due to a "qualifying dislocation." The program defines a "protected employee" as someone who has been employed by a certified air carrier for at least four years as of October 1978. 49 U.S.C. § 1552(h)(1). A "qualifying dislocation" is a bankruptcy or major contraction of a certified air carrier, the major cause of which is airline deregulation. 49 U.S.C. § 1552(h)(2).

At oral argument, the CAB's counsel informed the court that the CAB had decided Braniff suffered a major contraction under the terms of the program, but the question whether deregulation was the major cause of the contraction (the second prerequisite for participation in the program) was still pending before the Board.

**16.** Section 29 of the Airline Deregulation Act of 1978 amended section 412 of the Federal Aviation Act providing (1) air carrier mutual aid agreements are subject to Board approval; (2) payments to air carriers cannot exceed 60% of direct operating expenses incurred during a strike; (3) benefits cannot be paid to a carrier for more than 8 weeks during a strike; (4) no benefit can be paid during the first 30 days of a strike; and (5) all parties to the agreement must submit to binding arbitration if employees request it. 49 U.S.C. § 1382(c); *see also* H.R. REP. No. 1779, 95th Cong., 2d Sess. 75–77 (1978)

(Conference Report), U.S.Code Cong. & Admin. News 1978, p. 3737; 124 CONG.REC. 38525–26 (1978) (remarks by Rep. Harsha).

**17.** Recent legislation, cited by BMEC, does not detract from this conclusion. A new law extending the aviation insurance program for five years also contains an amendment to the Federal Aviation Act which defers transfer to the Justice Department of the CAB's authority to approve carrier transactions under section 408. Act of Oct. 14, 1982, § 3, Pub.L. No. 97–309, 96 Stat. 1453 (amending 49 U.S.C. § 1542). Senator Kassebaum, sponsor of the amendment, noted that transfer of the approval authority to the Department of Justice might also take away the CAB's authority to impose LPPs on section 408 transactions. The amendment was designed to insure "that jurisdiction remain at the Board with authority to impose" LPPs. 128 CONG.REC. S7236 (daily ed. June 21, 1982) (remarks by Sen. Kassebaum). The Senator requested that "the CAB continue to impose these standard labor protective provisions in a manner consistent with its handling of section 408 transactions prior to the enactment of the Airline Deregulation Act of 1978." *Id.*

If the CAB is to act "in a manner consistent" with its previous standards, its decisions must rest on the overall public interest. Thus, while the statements of Senator Kassebaum and the recent congressional action indicate concern about labor protection, Congress has consistently avoided directing the CAB to impose LPPs on all section 408 transactions.

which the parties to the merger or transfer strongly oppose LPPs. Past practice, the Board maintains, cannot control this "first time" situation.

Eastern, like Pan Am before it, vigorously objected to LPPs for Braniff's U.S.-based personnel, including pilots;[18] a clause in the Eastern/Braniff agreement allowed Eastern to terminate the agreement without notice if the Board imposed LPPs.[19] There was a pressing need to insure continued U.S.-flag service to South America, and Eastern's was the only viable application for the route network which did not threaten to reduce competition.[20] The CAB concluded it could not risk the possibility that Eastern would exercise the termination clause. Given these circumstances, we are unable to declare unreasonable the Board's decision not to impose LPPs before approving an interim arrangement.

The Board emphasizes a further relevant consideration. It had put all parties on notice after the passage of the Airline Deregulation Act not to rely on past practice: "LPP's will no longer be imposed as a matter of course, or because tradition dictates their use. We therefore advise labor to negotiate its own protections through the collective bargaining process at the first opportunity." *Texas International-Pan American-National Acquisition,* Order 79–12–163/164/165 at 67 (October 24, 1979). The warning to labor to resort to the bargaining table and not to rely on the agency was inescapable.[21]

Finally, we underscore that our ruling, like the Board's is tentative. Interested labor parties, including BMEC, will soon have an opportunity to be heard on whether LPPs should be imposed at this juncture. The Board has represented that, in the hearing about to occur, it will entertain argument for retroactive imposition of LPPs. Order 82–4–144 at 4 n. 4, J.A. 150. The CAB's ultimate decision on the appropriateness of LPPs for Braniff's former

18. Braniff also opposed imposition of LPPs. The Air Line Pilots Association, International has sued Braniff, on behalf of BMEC, for breach of the collective bargaining agreement, alleging that the bargaining agreement requires Braniff to support LPPs in a merger. *Air Line Pilots Ass'n v. Braniff Airways, Inc.,* No. 82–1157 (E.D.N.Y. filed April 27, 1982). Section 25(B) of the collective bargaining agreement provides:

> In the event of a sale, merger, acquisition or consolidation, the Company [Braniff] will support labor protective provisions for the pilots no less favorable than the labor protective provisions specified by the Civil Aeronautics Board in the Allegheny-Mohawk merger.

[*See supra* note 2 for the LLPs in Allegheny-Mohawk.]
J.A. 185.

Proceedings in that case have been stayed while Braniff is under the protection of the bankruptcy court.

19. Eastern made the agreement with Braniff contingent on CAB approval which was defined as containing

> no conditions ... which either party considers (and so notifies the other within ten days after the date of such orders) materially adverse to its interests; it being understood that the imposition of labor protective provisions on either party shall be deemed materially adverse to the interests of the parties without any requirement of further notice.

J.A. 25–26.

20. Two other carriers expressed an interest in the Braniff network, but neither submitted an application within the emergency time limits set by the CAB. One of the carriers, Western Air Lines, Inc., attempted to meet with Braniff officials, but Braniff cancelled the meeting on April 23, when it became apparent that Western could not come up with a timely proposal. J.A. 47.

The other carrier, Air Florida, Inc., sought to make a joint offer with Pan Am for the Braniff network. Braniff officials told the CAB Air Florida "had a will but not a way or the wherewithall [sic] to put together a package to take over the Braniff operations and to do it in time to meet Braniff's needs." J.A. 46–47. Nevertheless, Air Florida and Pan Am had planned to file an application on April 26, but 20 minutes before the start of the Board's closed meeting, Air Florida's attorney told CAB officials "there would be no document filed with [the CAB] today and there might or might not be one tomorrow; and that hadn't been decided." J.A. 68–69.

As indicated *supra* note 11, Air Florida and Pan Am subsequently filed an application for the Braniff network. The CAB consolidated this application with the Eastern/Braniff application in its September 22 procedural order.

21. *But cf. supra* note 17.

U.S.-based personnel will be subject to court review.

### 2. The CAB impermissibly prolonged the deferral period.

As the CAB acknowledged, the fifteen-month interim award to Eastern is "longer than is usually provided for *pendente lite* exemptions," Order 82–4–144 at 4, J.A. 150. At oral argument, the CAB's counsel broke down the fifteen-month period as follows: twelve months for CAB action, two months for subsequent presidential review,[22] and some "leeway" (presumably one month) to allow for negotiations with South American governments to provide a smooth transition, if Eastern's application eventually is disapproved.[23] CAB counsel also represented that the purpose of the lengthy interim award was to afford Eastern an opportunity to recoup its $11 million initial payment to Braniff.

Section 1010 of the Federal Aviation Act[24] provides that the CAB shall issue a final order within twelve months of the submission of a section 412 application and within six months of the submission of a section 408 application. Section 1010 was adopted as part of the Airline Deregulation Act of 1978; throughout the long gestation period of this law, CAB officials consistent-ly opposed the setting of statutory time limits and urged that Congress leave the matter to the CAB, to insure administrative flexibility.[25] The CAB's pleas for flexible time limits were not effective. Congress passed section 1010, which sets fixed periods.

In its September 22, 1982, order, the CAB determined:

> Since these agreements were submitted for approval under section 412 of the Act, we interpret section 1010 as allowing one year from the end of April 1982, for final Board decision. Although § 408 is also in issue, we perceive no legal or compelling policy reasons to adhere to the § 408 timetable.

*Braniff South American Route Transfer Case,* Order 82–9–81 at 14 n. 22 (September 22, 1982). The Board's position, supported by its order in *Air Florida System, Inc. (LACSA),* Order 82–1–108 at 2 n. 3 (January 25, 1982), is that whenever both sections 408 and 412 are in issue, it has discretion to choose either the twelve-month timetable applicable to section 412 transactions or the six-month timetable specified for section 408 transactions. In *LACSA,* the Board announced it intended to follow the earlier deadline.[26] In this case, however, because

---

**22.** Section 801 of the Federal Aviation Act, 49 U.S.C. § 1461, affords the President 60 days to disapprove CAB certification decisions regarding foreign air transportation.

**23.** Since the issue has not been aired before us by the interested parties, we take no position on the question whether the Board may grant interim authority for a period exceeding the statutory time limit for the CAB's decision on long-term authorization plus the 60 days allowed for the President's review.

**24.** Section 1010, 49 U.S.C. § 1490, provides in relevant part:

> In the case of any application or other written document submitted to the Board under section 408, 409, 412, or 416 of this Act, . . . the Board shall—
> (1) if the Board orders an evidentiary hearing, issue a final order or decision with respect to such written document, not later than the last day of the twelfth month which begins after the submission of such document, except in the case of an application submitted under section 408 of this Act, the

Board shall issue its final order or decision not later than the last day of the sixth month after submission. . . .

**25.** *See Regulatory Reform in Air Transportation: Hearings on S. 292 and S. 689 Before the Subcomm. on Aviation of the Senate Comm. on Commerce, Science and Transportation,* 95th Cong., 1st Sess. 213–14 (1977) (CAB analysis of the Air Transportation Regulation Reform Act of 1977, appended to the statement of John E. Robson, Chairman of the CAB); *Aviation Regulatory Reform: Hearings on H.R. 8813 Before the Subcomm. on Aviation of the House Comm. on Public Works and Transportation,* 95th Cong., 1st Sess. 193 (1977) (CAB legislative program appended to the statement of John E. Robson, Chairman of the CAB); *id.* at 1105 (CAB analysis of the Air Service Improvement Act of 1977); *id.* at 1117–18 (statement of Alfred E. Kahn, Chairman of the CAB).

**26.** The parties in *LACSA* have waived the statutory deadline because they want to wait for the reaction of the new Costa Rican govern-

of the complexity involved in reviewing an entire route network, the Board opted for the longer period. Brief for Respondent at 32–33.

 We cannot accept the Board's position, however, because it would effectively nullify, in any case in which the transaction is consensual, the six-month deadline for decision Congress set for transactions embraced by section 408. Section 412 applies to "any contract or agreement" between air carriers; section 408 applies only to mergers, consolidations or acquisitions of substantial property of other air carriers. Since a consent-based merger, consolidation or substantial acquisition involves a contract or agreement, every time section 408 is in issue in such a case, the Board may assert that section 412 is also in issue. Characterization of this kind would enable the CAB to opt for the longer period to suit its convenience; the six-month limit would not apply unless the CAB elected to invoke it. "[N]o statute ought to receive a construction which would render it nugatory." *United States v. Tappan*, 24·U.S. (11 Wheat.) 419, 426, 6 L.Ed. 509 (1826); *see also NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937) ("[t]he cardinal principle of statutory construction is to save and not to destroy"). We therefore hold that, as to any matter subject to the gov-

ernance of section 408, the CAB, if a party so insists, must act dispositively within six months.

 The Board's argument for the twelve-month period, based on the complexity of this case, is unavailing since Congress did not tie the limitation periods to that factor, although such an approach might have made good sense. The legislative history, while it is sparse, indicates that the six-month deadline was set without regard to complexity, but with a particular view to facilitating stability in the financial markets by lessening the period of uncertainty faced by the parties to the merger.[27] One might read the legislative history to suggest that only the principal parties to the merger, in this case, Eastern and Braniff, can invoke the section 1010 time limitations. Neither Eastern nor Braniff has raised objections to the CAB's decision to follow the one-year time schedule, and under this narrow reading of the legislative design for section 1010, BMEC would not be positioned to complain about the Board's scheduling.

We believe such a narrow interpretation is inappropriate. Congress sought to expedite merger approvals to lessen interim uncertainty. BMEC, along with competitors for the Braniff network, face an uncertain situation, as do Eastern and Braniff, as long as the section 408 application is pend-

---

ment to the application. The CAB has postponed indefinitely any decision in the case. Air Fla. Sys., Inc., Order 82–6–28 (June 3, 1982).

**27.** The six-month merger deadline was originally proposed by the Senate as an amendment to section 408. The purpose was to expedite proceedings:

> [S]ection 408 does not contain any time limits on the processing of merger applications. Since an evidentiary hearing has been required for approving such actions, carriers may face a substantial period of uncertainty before they learn whether or not they may proceed. Consequently, even under reformed procedure, time limits are necessary to insure that parties to mergers, and other transactions governed by section 408, receive a relatively expeditious determination of their petitions for approval.

S.Rep. No. 631, 95th Cong., 2d Sess. 79 (1978).

This amendment was transferred to section 1010 by the conference committee, where it was merged with the House provision setting

time deadlines. H.R.Rep. No. 1779, 95th Cong., 2d Sess. 100–02 (1978) (Conference Report).

An earlier version of the Airline Deregulation Act, the proposed National Air Transportation Act of 1978 (H.R. 9297), generally urged the Board to act expeditiously in deciding applications, including those submitted under section 412, but set a rigid one-year deadline for final Board action on section 408 applications. Representative Levitas, sponsor of the bill, explained:

> Most transactions subject to section 408 are of a nature that the companies involved are significantly fettered until they know whether the transaction in question will be approved. For this reason, there is a need for the utmost expedition in the case of such applications.

123 Cong.Rec. 31384 (1977) (remarks by Rep. Levitas).

ing. For example, delay in deciding on LPPs may cost BMEC pilots valuable flying time, perhaps as significant to them as their monetary loss. We therefore conclude that BMEC, as a party *affected* by the merger, can invoke the relevant section 1010 time limit, but only to the extent of BMEC's interest in the transaction. More precisely, BMEC can invoke the time limit only as it bears on the Board's decision whether to impose LPPs.

Had it adhered to the section 1010 limitation, the CAB would have authorized only a six-month time schedule for decision. Since BMEC has invoked the relevant deadline, the Board should have scheduled its proceedings so as to arrive at its final disposition of the LPP matter in the context of the Eastern/Braniff agreement before the end of October 1982.

The statutory time limitations are new and have not had a judicial airing in any prior case. Moreover, were we to order the Board to decide the LPP question forthwith, no full hearing or thoughtful consideration would be possible. We therefore remand the case to the CAB with instructions that, in view of BMEC's objection to deferred disposition, the Board may not further delay final decision on LPPs under the Eastern/Braniff agreement beyond ninety days from the date our mandate issues. *See Northwest Airlines, Inc. v. CAB,* 539 F.2d 748, 753 (D.C.Cir.1976).

### CONCLUSION

For the reasons stated, the order on review is affirmed in principal part and remanded for further proceedings consistent with this opinion.

*It is so ordered.*