**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, Respondent,**

**Trans International Airlines, Inc., Intervenor.**

**No. 85–1178.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1986.

Decided May 16, 1986.

Gary Green, with whom Sarah Perry Fleischer, Washington, D.C., was on brief, for petitioner.

Thomas L. Ray, Atty., Dept. of Transp., with whom Kenneth N. Weinstein, Deputy Asst. Gen. Counsel, Dept. of Transp., John J. Powers, III and George Edelstein, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondent.

Jeffrey A. Manley, Washington, D.C., for intervenor, Trans Intern. Airlines, Inc.

Before ROBINSON, Chief Judge, and MIKVA and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The petitioner union, Air Line Pilots Association (ALPA), represents pilots employed by Transamerica Airlines. ALPA challenges two orders of the Civil Aeronautics Board approving a transaction by which Transamerica's holding company acquired control of an inactive carrier, the intervenor Central American International, Inc. (since renamed Trans International Airlines, Inc.). ALPA contends that the Board abused its discretion and acted arbitrarily and capriciously in refusing to condition its approval of the acquisition on the imposition of labor protective provisions (LPP's), and in refusing to hold an evidentiary hearing on that issue. Because we find that the orders under review embody a satisfactory explanation of the Board's new policy governing LPP's and that that policy is consistent with the Board's statutory

mandate, we reject ALPA's substantive challenge. Moreover, because the Board reasonably determined that ALPA did not make a credible showing that it could introduce evidence meeting the Board's new standard, we also conclude that the Board did not err in denying ALPA a hearing.

## I.

In the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705, Congress drastically reduced its regulation of air carriers. Nevertheless, Congress retained several salient features of the preexisting regulatory regime. Under what is now Section 408(b) of the Federal Aviation Act, 49 U.S.C. App. § 1378(b) (1982), the Civil Aeronautics Board [1] reviews airline mergers and acquisitions under a "public interest" standard. The Act specifically prohibits approval of transactions raising certain enumerated antitrust concerns. *See id.* § 1378(b)(1)(A)–(B). Otherwise, however, the Board is granted broad discretion to advance its view of the public interest, informed only by the general purposes of the Act and by a non-exhaustive list of public-interest factors located elsewhere in the statute. *See id.* § 1302. Moreover, the Board is empowered to grant its approval of such transactions "upon such terms and conditions as it shall find to be just and reasonable...." *Id.* § 1378(b). For many years, the Board had followed this public interest mandate by conditioning approval of mergers and acquisitions upon the carrier's acceptance of LPP's such as displacement compensation and seniority rights. *See Braniff Master Executive Council v. CAB*, 693 F.2d 220, 222–23 (D.C.Cir.1982), and cases cited therein.

In March 1984, Transamerica's holding company sought the Board's approval of its acquisition of Central American International, Inc., an inactive carrier (with no employees) that held certificates entitling it to provide all-cargo air services and charter air transportation. Transamerica's plan was to transform the acquired company (renamed Trans International Airlines) into a low-cost air carrier; among other things, the application indicated that the new carrier would not be bound by Transamerica's existing labor contracts. The Board issued an order to show cause why Transamerica's application should not be approved. ALPA opposed the application, contending, *inter alia,* that the acquisition should be conditioned upon the imposition of LPP's.[2] Following a policy announced in several recent cases,[3] however, the Board declared that it would insist upon LPP's only in situations in which it was apparent that labor strife threatening a systemwide disruption of the nation's airways would otherwise result. The Board concluded that ALPA's proffer of evidence in opposition to the application failed to raise a genuine dispute over whether Transamerica's acquisition would spur labor strife of national scope, and accordingly denied ALPA's demand for LPP's without a hearing. The Board thus approved Transamerica's application as consistent with the public interest (two members dissenting in part). ALPA's request for reconsideration was denied, and it filed this petition for review of the Board's orders pursuant to 49 U.S.C.App. § 1486 (1982).

## II.

In recent years, the Board has altered its approach to the imposition of LPP's in the merger and acquisition context. Whereas over the past few decades the Board had quite routinely conditioned its approval of these transactions on the carrier's acceptance of labor protective terms, the Board's new policy calls for such conditioning only when it appears necessary to avoid labor strife capable of causing systemwide disruption of the nation's airways. In light of the Board's policy shift, the petitioner sug-

---

1. The Board was abolished at the end of 1984 and the regulatory functions at issue here were transferred to the Department of Transportation. *See* 49 U.S.C.A. § 1551(b) (West Supp. 1985). For the sake of convenience, however, we refer to the "Board" throughout this opinion.

2. ALPA primarily argued to the Board that Transamerica's application should be rejected. Thus, it is not clear from the record exactly what form of LPP's ALPA would have had the Board impose.

3. *See, e.g.,* CAB Orders 84–1–16 & 84–1–17 (Jan. 6, 1984), *vacated as moot, International Ass'n of Machinists v. Dole,* No. 84–1005 (D.C.Cir. May 17, 1985) (Frontier Horizon proceeding); CAB Order 80–12–57 (Dec. 11, 1980), *aff'd, Airline Pilots Ass'n v. CAB,* 643 F.2d 935 (2d Cir.1981) (New York Air proceeding).

gests that this case is governed by the standards of *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In *State Farm,* the Supreme Court instructed that an agency's departure from a longstanding policy implementing the agency's statutory mandate should be carefully scrutinized by a reviewing court. *Id.* at 40–42, 103 S.Ct. at 2865–66. The Court adverted to a "presumption" that an agency's "settled course of behavior" would best advance the objectives of the statute it administers. *Id.* at 41–42, 103 S.Ct. at 2865–66 (quoting *Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807–08, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973)). *See also International Bhd. of Teamsters v. United States,* 735 F.2d 1525, 1531–32 (D.C.Cir.1984); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 812–14 (D.C.Cir.1983).

It seems to us, however, that this case is a far cry from *State Farm.* The agency's change in policy here came in response to Congress' change in the *statute* from which that policy derived. The Airline Deregulation Act of 1978 dramatically overhauled national aviation policy, rejecting the elaborate regulation of air carriers' business decisions that had traditionally marked that policy in favor of enhanced reliance on competitive market forces. Thus, any "presumption" that an agency's existing policies best maintain fidelity to congressional intent simply has no application here. Given the modification of its statutory charter, it is hardly surprising that the Board reconsidered its longstanding policy governing the standards by which it approves mergers and acquisitions.[4] Although the Airline Deregulation Act preserved the Board's jurisdiction to review these transactions for consistency with the "public interest," *see* 49 U.S.C. App. § 1378(b)(1) (1982),[5] it is apparent that

Congress did not thereby mean to preserve the gloss previously placed upon that standard. The Conference Report accompanying the Act states:

> The "public interest" standard in section 408(b) of the Federal Aviation Act of 1958 is retained in the new section, but that standard must now be interpreted in light of the intent of Congress to move the airline industry rapidly toward deregulation. The foundation of the new airline legislation is that it is in the public interest to allow the airline industry to be governed by the forces of the marketplace.

H.R.Rep. No. 1779, 95th Cong., 2d Sess. 73 (1978), U.S.Code Cong. & Admin.News 1978, pp. 3737, 3789.

In articulating its new policy, the Board maintained that routine resort to LPP's in the merger and acquisition context no longer makes sense in a deregulated era. The Board suggested that approval of transactions such as the present one would further the purposes of the Airline Deregulation Act by facilitating the creation of new low-cost carriers; in its view, the Act directed it "to promote entry by lower cost, more efficient carriers, which may spur the incumbents to operate more efficiently." CAB Order 84–7–60, at 13 (July 19, 1984). The Board indicated that labor protective conditions, which presumably raise the costs of such transactions, are justifiable primarily as a safeguard against labor strife disruptive of the air transportation system. In the past, an era characterized by strict controls upon carrier services and limits upon the entry of new carriers, a strike by employees of a single carrier had been regarded as a potential threat to the entire air transportation network. By contrast, the Board reasoned, "in a deregulated era of freer entry, other carriers can now respond to provide the air transportation services of the struck carriers." *Id.* at 12

---

4. Even under *State Farm,* an agency need only "supply a reasoned analysis" supporting its decision to alter a longstanding policy. 463 U.S. at 42, 103 S.Ct. at 2866.

5. We note, however, that since the conclusion of this proceeding new regulations have been issued that exempt from "public interest" review, *inter alia,* transactions involving the acquisition of a carrier not actually operating passenger services. *See* 14 C.F.R. § 303.50(a) (1986).

(July 19, 1984). Thus, the Board saw no urgent need to intervene into carrier mergers and reorganizations to preclude the possibility of a strike. Finally, the Board suggested that any adverse effects upon the incumbent carriers' employees that such transactions might occasion could be mitigated through the collective bargaining process. The Board observed in this regard that the employees of other carriers who had recently entered similar transactions had successfully bargained with their employers for various labor protections.

■ We believe that the Board's orders at issue survive the limited scrutiny appropriate under the arbitrary and capricious standard of review. In this proceeding, the Board "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866–67 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). The Board adequately explained both the policy considerations and the empirical judgments supporting its new stance. The Board based its judgment that general labor unrest following on the heels of transactions like the present one was unlikely on its knowledge of the industry; it based its view that collective bargaining could adequately protect employee interests on the experience of other carriers who had engaged in similar transactions. These were matters of prediction, necessarily uncertain, to which the Board brings its expertise to bear; contrary to ALPA's contention, the Board was not required to substantiate its predictions with record evidence. *See FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978); *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 28–29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961); *Industrial Union Dep't, AFL–CIO v. Hodgson*, 499 F.2d 467, 474–76 (1974). Further, the Board's judgments in this case are not so implausible as to justify second-guessing by a court. *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866 ("[A] court is

not to substitute its judgment for that of the agency.").

To be sure, the petitioner is correct insofar as it asserts that prior to the Airline Deregulation Act of 1978 the Board imposed LPP's not solely to insure against systemwide disruptions caused by labor disputes. On various occasions, the Board had explained that it also sought to cushion the impact on employees—as a matter of equity—of the Board's approval of a route transfer or merger. *See, e.g., United-Western Acquisition Case*, 11 CAB 701 (1950), *aff'd sub nom. Western Air Lines v. CAB*, 194 F.2d 211 (9th Cir.1952). The Board, then, has not been totally accurate in this proceeding in its account of the history surrounding its imposition of LPP's. We think it unmistakable, moreover, that the Board's new policy objectives are not entirely consistent with those pursued prior to 1978. While the Board's new approach to mergers and acquisitions does not completely ignore the interests of affected employees, ALPA argues with some force that the new approach extends far less protection to those interests than has traditionally been the case. As we have already indicated, however, *see supra* pp. 4–6, the Board was free to reassess its policy priorities in light of the Airline Deregulation Act's enactment. While the Board's orders under review may be flawed in their historical analysis, they do provide a satisfactory explanation of the considerations underlying the Board's *current* approach.

Moreover, the Board's policy choices concerning labor protections in the merger and acquisition context are well within the broad zone of discretion delegated it by the Act. Even prior to the Airline Deregulation Act, it was clear that the Board was not required but merely authorized by the "public interest" standard to impose LPP's. *See Braniff Master Executive Council*, 693 F.2d at 227–28. Since that enactment, the Board has concluded, not unreasonably, that labor protective conditions upon mergers and acquisitions are out of step with the new national policy favoring competi-

tion among carriers and reliance upon market forces to meet the needs of the public. Such conditions would serve to place incumbent carriers at a disadvantage vis-a-vis new entrants, who incur only those labor costs bargained for by their employees. In an era of relatively free entry into the field, such differential treatment could well prove anomalous. Of course, Congress could seek to spur deregulation while also attempting to lessen the blow on existing employees; in fact, it did just that in Section 43 of the Airline Deregulation Act, 49 U.S.C.App. § 1552 (1982), which authorized monthly "assistance payments" to employees of carriers displaced by deregulation (a cost borne, however, by the federal treasury rather than by incumbent carriers). The question at issue in this case is whether the Board acted reasonably in declining to impose *additional* protections under its broad public interest mandate. In this regard, we are mindful of this court's admonition that "faced with specific statutory provisions responsive to labor interests, a court cannot force an agency to infer other, specific, labor protective commands from broad congressional language that suggests discretion more than direction." *Braniff Master Executive Council,* 693 F.2d at 228 (footnote omitted).

■ The petitioner argues, however, that the Board's new policy gives short shrift to one of the public-interest factors codified by Congress in connection with the enactment of the Airline Deregulation Act: "the need to encourage fair wages and equitable working conditions for air carriers." Federal Aviation Act § 102(a)(3), 49 U.S.C. App. § 1302(a)(3) (1982). This argument rests on the implausible premise that the Act gave labor parties something they lacked under the previous regulatory regime, *i.e.,* an *assurance* that the Board would consider imposing LPP's in every case. *Cf. Braniff Master Executive Council,* 693 F.2d at 228; *Air Line Pilots Ass'n v. CAB,* 643 F.2d 935, 940 (2d Cir.1981).

It is significant, moreover, that this factor is just one of many that Congress has directed the Board to consider.[6] While

---

**6.** Section 102(a) of the Federal Aviation Act reads in full:

In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

(1) The assignment and maintenance of safety as the highest priority in air commerce, and prior to the authorization of new air transportation services, full evaluation of the recommendations of the Secretary of Transportation on the safety implications of such new services and full evaluation of any report or recommendation submitted under section 1307 of this title.

(2) The prevention of any deterioration in established safety procedures, recognizing the clear intent, encouragement, and dedication of the Congress to the furtherance of the highest degree of safety in air transportation and air commerce, and the maintenance of the safety vigilance that has evolved within air transportation and air commerce and has come to be expected by the traveling and shipping public.

(3) The availability of a variety of adequate, economic, efficient, and low-price services by air carriers and foreign air carriers without unjust discriminations, undue preferences or advantages, or unfair or deceptive practices, the need to improve relations among, and coordinate transportation by, air carriers, and the need to encourage fair wages and equitable working conditions for air carriers.

(4) The placement of maximum reliance on competitive market forces and on actual and potential competition (A) to provide the needed air transportation system, and (B) to encourage efficient and well-managed carriers to earn adequate profits and to attract capital, taking account, nevertheless, of material differences, if any, which may exist between interstate and overseas air transportation, on the one hand, and foreign air transportation, on the other.

(5) The development and maintenance of a sound regulatory environment which is responsive to the needs of the public and in which decisions are reached promptly in order to facilitate adaption of the air transportation system to the present and future needs of the domestic and foreign commerce of the United States, the Postal Service, and the national defense.

(6) The encouragement of air service at major urban areas in the United States through secondary or satellite airports, where consistent with regional airport plans of regional and local authorities, and when such encouragement is endorsed by appropriate State entities encouraging such service by air carriers whose sole responsibility in any specific mar-

the Board must *consider* all these factors, the weight to be given to any particular factor lies largely within its discretion. The Act itself does not dictate that the Board give priority to "the need to encourage fair wages and equitable working conditions" over other, potentially conflicting factors such as "[t]he availability of a variety of adequate, economic, efficient, and low-price services by air carriers ...," 49 U.S.C.App. § 1302(a)(3) (1982), "[t]he placement of maximum reliance on competitive market forces ...," *id.* § 1302(a)(4), or "[t]he encouragement of entry into air transportation markets by new air carriers ...," *id.* § 1302(a)(10). If it were obvious that the Board had blatantly refused to consider a factor that Congress commanded it to consider, we would of course be obliged to set aside its orders. *See Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95

S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The Board maintained, however, that it had considered the interests of employees but concluded that they could be adequately protected by the collective bargaining process, as they had been in several recent instances. *See, e.g.,* CAB Order 84–7–60, at 12 (July 19, 1984).[7] The Act does not require more. Congress has not sought to prescribe the precise balance to be struck between the interests of labor and management in this context.[8] Under these circumstances, we must respect an agency's policy choice "resolving the competing interests which Congress ... left to be resolved by the agency charged with the administration of the statute...." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865–66, 104 S.Ct. 2778, 2793, 81

ket is to provide service exclusively at the secondary or satellite airport, and fostering an environment which reasonably enables such carriers to establish themselves and to develop their secondary or satellite airport services.

(7) The prevention of unfair, deceptive, predatory, or anticompetitive practices in air transportation, and the avoidance of—

(A) unreasonable industry concentration, excessive market domination, and monopoly power; and

(B) other conditions;

that would tend to allow one or more air carriers or foreign air carriers unreasonably to increase prices, reduce services, or exclude competition in air transportation.

(8) The maintenance of a comprehensive and convenient system of continuous scheduled interstate and overseas airline service for small communities and for isolated areas in the United States, with direct Federal assistance where appropriate.

(9) The encouragement, development, and maintenance of an air transportation system relying on actual and potential competition to provide efficiency, innovation, and low prices, and to determine the variety, quality, and price of air transportation services.

(10) The encouragement of entry into air transportation markets by new air carriers, the encouragement of entry into additional air transportation markets by existing air carriers, and the continued strengthening of small air carriers so as to assure a more effective, competitive airline industry.

(11) The promotion, encouragement, and development of civil aeronautics and a viable, privately owned United States air transport industry.

(12) The strengthening of the competitive position of United States air carriers to at least assure equality with foreign air carriers, including the attainment of opportunities for United States air carriers to maintain and increase their profitability, in foreign air transportation.

49 U.S.C.App. § 1302(a) (1982).

**7.** The Board also implied, although it did not explicitly state, that the imposition of LPP's would not effectively protect wage rates in a climate of free entry, but that the expanded work opportunities flowing from deregulation provide offsetting benefits to airline employees. *See* CAB Order 84–10–50, at 5 (Oct. 12, 1984). That may or may not be so; deregulation brings winners and losers among employees as well as carriers. In any event, that the Board seems reluctant more fully to air its views on the interrelationship between free entry, existing wage rates, and LPP's may be regrettable, but it does not present grounds for reversal. *See Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

**8.** In fact, to the extent a hierarchy is discernible, the Act would seem to favor the interests of *consumers* above all others. *See* H.R.Rep. No. 1779, 95th Cong., 2d Sess. 72–73 (1978).

L.Ed.2d 694 (1984); *see also United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961) (courts must defer to "a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute").[9]

### III.

 The Board approved Transamerica's application in a show-cause proceeding and did not afford the petitioner a hearing. The Board justified this course by ALPA's failure to raise a material factual dispute on the issue it would need decided in its favor to prevail, *i.e.,* whether approval of the transaction would occasion nationwide labor strife. The petitioner proffered only a single affidavit of one of its members suggesting that Board approval of Transamerica's acquisition could cause other carriers to undertake similar transactions and thereby spark widespread labor unrest in the industry. The Board characterized this contention as speculative and unsubstantiated and concluded that "there has been no credible showing that as a result of our approval of this transaction, there will be labor strife that will disrupt the entire air transportation system...." CAB Order 84–10–50, at 6 (Oct. 12, 1984). We believe the Board acted reasonably in determining that ALPA's submission failed to raise a material factual dispute. That being so, it follows that no hearing was required. *See ALPA v. CAB,* 494 F.2d 1118, 1130–31 (D.C.Cir.1974); *see also Costle v. Pacific Legal Found.,* 445 U.S. 198, 213–15, 100 S.Ct. 1095, 1104–05, 63 L.Ed.2d 329 (1980); *FPC v. Texaco, Inc.,* 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956); *Connecticut Bankers Ass'n v. Board of Governors of Fed. Reserve Sys.,* 627 F.2d 245, 251–54 (D.C.Cir.1980); *Citizens for Allegan Coun-*

*ty, Inc. v. FPC,* 414 F.2d 1125, 1128–29 (D.C.Cir.1969).

Accordingly, the petition for review is *denied.*

---

**9.** That the factors identified by Congress as in the "public interest" are potentially conflicting may well explain why the Board's rationale for changing its policy is not all that one might wish. It probably takes more valor than discretion for an agency to explain that the factors Congress has directed it to consider, while touching all political bases, provide contradictory guidance as to the implementation of a regulatory scheme.